[No. C016482. Third Dist. Apr. 9, 1996.]

ROBERT L. CONRAD et al., Plaintiffs and Appellants, v.
BANK OF AMERICA, NATIONAL TRUST AND SAVINGS
ASSOCIATION, et al., Defendants and Respondents.

**COUNSEL**

Eisen & Johnston, Jay-Allen Eisen, Marian M. Johnston, Karen Leaf, Ann Perrin Farina, Seaman, Seaman & Ostwald, Mitchell S. Ostwald, Blackman & Blackman and Peter A. Blackman for Plaintiffs and Appellants.

Kristian D. Whitten, Arne D. Wagner, Michael J. Halloran, Weintraub, Genshlea & Sproul, Audrey A. Millemann, Crosby, Heafey, Roach & May, Peter W. Davis and Kathy M. Banke for Defendants and Respondents.

**OPINION**

**SPARKS, J.**—In *Oneida Motor Freight, Inc.* v. *United Jersey Bank* (3d Cir. 1988) 848 F.2d 414, the United States Court of Appeals for the Third Circuit held that a debtor's lender liability claims asserted against a bank in a postbankruptcy complaint were barred because the debtor failed to list those claims in the bankruptcy proceedings. The court concluded that the debtor "violated both its statutory and fiduciary duty to disclose this current claim

against the bank during the pendency of the bankruptcy case. By virtue of this failure to disclose, equitable and judicial estoppel operate against further litigation by [the debtor]." (*Id.* at p. 415.) The central issue in this case is whether the holding in *Oneida Motor Freight, Inc.* (*Oneida Motor Freight*), and its progeny bars relief in this case. We conclude it does.

In this fraud action the jury found in favor of plaintiffs Robert L. Conrad, Barbara L. Conrad and Industrial Enterprises, Inc. (Industrial Enterprises), and against defendants G. F. Burk and Bank of America, National Trust and Savings Association (Bank). The trial court granted defendants' motion for judgment notwithstanding the verdict based upon the plaintiffs' failure to list or otherwise identify their claims during their bankruptcy proceedings. On plaintiffs' appeal we shall affirm the judgment notwithstanding the verdict.

## Factual and Procedural Background

In the mid-1970's, Robert Conrad and his wife Barbara began operating a business engaged in high-pressure water blasting. Eventually they expanded into equipment fabrication, including chassis for the maritime industry.[1] At some point in time the Conrads incorporated their business under the name Industrial Enterprises, Inc.[2] In 1976 or 1977, defendant Burk, the manager of the Bank's Placerville branch office, solicited plaintiffs' business and the parties' business relationship began.

Over the next several years the Bank made numerous loans to the plaintiffs. This included a real estate loan secured by commercial property owned by the Conrads, a line of credit in the amount of $110,000, and a number of short-term operating loans.[3] During this time the business was marginal from a financial standpoint. It frequently suffered losses and although it successfully repaid its loans it was unable to accumulate operating capital and had a deficit net worth.

In mid-1982, Industrial Enterprises obtained a United States Small Business Administration (SBA) guaranteed loan from Government Funding,

---

[1] A maritime chassis is a skeletal trailer onto which a cargo container from a ship may be placed for transport over land.

[2] In order to qualify as a woman-owned business under federal law, which provides a variety of borrowing and contract bidding benefits (see 15 U.S.C. § 631 et seq.), Barbara Conrad was assigned 51 percent ownership and was named president of the corporation. However, it appears the business was primarily run by Robert Conrad and all of the transactions described in the record involved Robert Conrad on behalf of the corporation. In particular, during the events that gave rise to plaintiffs' claim, Barbara Conrad was away on vacation and did not learn of the matter until later.

[3] The real estate loan was made to the Conrads personally and was secured by a deed of trust on commercial property which they owned and leased to the business. The other loans to which we refer were made to the business.

California Business and Industrial Development Corporation (hereafter Government Funding) in the amount of $250,000. Most of that loan was used for debt repayment. As security for that loan Government Funding obtained liens on virtually all business assets of the corporation, guarantees from the Conrads secured by secondary liens on the commercial property and their residence, and an agreement that without prior written consent the business would not obtain additional loans or transfer or encumber business assets. Upon receipt of that loan plaintiffs advised Government Funding that in the normal course of business Industrial Enterprises utilized short-term loans for the construction of inventory in response to specific orders with repayment from receipts. Government Funding, with SBA approval, agreed to grant an exception to its loan contract which permitted Industrial Enterprises to borrow up to $125,000 from the Bank for a period not to exceed three months.

In September 1982, Burk advised plaintiffs that the Bank would not entertain applications for long-term loans but would supply only working capital loans against completed contracts on which the Bank would carry assignments. In early March 1983, the Bank terminated Industrial Enterprises's line of credit. Burk advised plaintiffs that the reasons for this were that the company had operated at a loss for the past two years and its deficit net worth was expected to increase further. After ensuing discussions with Robert Conrad, the Bank did not restore the line of credit but did agree to consider loan requests on an individual, one-by-one, basis. For collateral the Bank took security interests in company vehicles and trailers and obtained a security agreement and assignment of contracts.

During 1983 and into the first half of 1984, the Bank extended a number of short-term loans to Industrial Enterprises. The last loans extended to Industrial Enterprises were approved by Burk in May and June 1984. In early May 1984, Burk approved two short-term working capital loans for $40,000 each. The loans were to mature in early August 1984, and were to be repaid out of payments due Industrial Enterprises from previously billed receivables. Burk approved an additional loan for $20,000 in June. After the loans had matured in August and the customer payments earmarked for their payment were received, Industrial Enterprises sought to extend the debt through additional loans. Burk would not agree to extend additional loans to Industrial Enterprises, but he did agree to let funds paid on behalf of Industrial Enterprises in August "pass through" to the company rather than being applied to debt repayment. He did so because at that time Industrial Enterprises had billed receivables for goods supplied to Matson Navigation Company (Matson), which plaintiffs agreed would serve as the source for payment of the outstanding loans.

Matson was one of Industrial Enterprises's major customers for maritime chassis. In the summer of 1984 Matson was contemplating a major acquisition of chassis and plaintiffs wished to expand their production capacity in order to participate as suppliers. However, they were not in a position to do so without outside assistance for a number of reasons: Industrial Enterprises had a negative net worth with no accumulated working capital; as individuals the Conrads owed money under first deeds of trust on their residence and their commercial property and had given secondary liens against those properties to secure their guarantees of the Government Funding loan; Industrial Enterprises had pledged virtually all of its assets as security for the Government Funding loan and had agreed not to sell or encumber its assets or to borrow additional funds except for small, short-term, working-capital loans from the Bank; Industrial Enterprises still owed the Bank for the loans it had extended in the first half of the year; and Industrial Enterprises had substantial outstanding accounts payable owed to previous suppliers of materials. Robert Conrad asked Burk if the Bank would consider making a large capital loan and was told that it would not. They discussed options and it was suggested that the Conrads could consider selling the company, going public with a stock offering, or finding a partner or joint venturer.

The plaintiffs decided to attempt to find a joint venturer and to this end Robert Conrad spoke with his material suppliers. Industrial Enterprises was referred to a company called AG Motors and they began negotiating the terms of a joint venture. Eventually Industrial Enterprises and AG Motors entered into a joint venture agreement under which Industrial Enterprises would build chassis frames and AG Motors would complete construction of chassis to be supplied to Matson. The joint venturers agreed to submit a bid under Industrial Enterprises's name to supply Matson with 125 chassis at a minimum profit margin in order to ensure a contract award. They anticipated that the initial order would allow them to get the "glitches" out of their venture and build their credibility and reputation. Industrial Enterprises submitted a bid to Matson in July and in August Matson determined to award the contract to Industrial Enterprises. Matson issued a written purchase order for 125 chassis on September 19, 1984.

On August 24th and August 28th, AG Motors and Industrial Enterprises exchanged letters confirming their agreement to the joint venture. Pursuant to that agreement, Industrial Enterprises expected to receive a substantial infusion of working capital by the end of August. On August 31st Robert Conrad called AG Motors for a progress report and was told that AG Motors was withdrawing from the venture.

The events that transpired shortly after AG Motors withdrew from the joint venture form the basis for plaintiffs' claim against the Bank and Burk.

Robert Conrad testified that he talked to Burk a few days after learning that AG Motors was withdrawing. He told Burk that they were going to use their liquid asset base and "that kind of thing" before talking to him further about loans. He discussed the possibility that Industrial Enterprises would need some loans and testified that Burk said, "No problem." During the week of September 17th, Conrad told Burk that he was running out of liquid assets and that it appeared he would need some money for the October 5th payroll. About that time payment was due from earlier Matson billings that was earmarked for paying down the outstanding debt to the Bank so that approximately $14,000 would be left due on earlier loans. Conrad contemplated obtaining an initial $40,000 loan which would be used to pay off the earlier loan and provide about $26,000 for operations. Although Conrad could not recall Burk's specific words and did not think that "approval" was used, he testified that Burk agreed to process the loan request and indicated "[t]hat he would comply," which Conrad understood to mean that he would make the loan. A few days later Burk told Conrad that the Bank would require an updated assignment of proceeds from Matson and on the 24th Conrad forwarded an assignment to Matson for execution. Conrad testified that Burk had scheduled a meeting at the Bank for the 26th, but that Burk was not there when Conrad arrived. Burk's assistant, Bud Grumm, told Conrad that the Bank was not going to make the loan. Conrad returned to the Bank on the morning of the 27th at which time Burk told him "you haven't been hearing what I have been telling you right along. We are not going to make the loan."

Burk testified that in the latter part of September Robert Conrad made a request for financing with an initial loan request in the amount of $40,000, but he denied that he agreed to make such a loan. In his conversation with Conrad a few days before the 26th or 27th, Burk was told that Industrial Enterprises could not provide any billed receivables for repayment and security purposes. In addition to Burk's general knowledge of the company's financial status, the lack of billed receivables and the fact that the Bank had a past-due loan on the books were Burk's particular reasons for denying the loan request.

After Burk refused to approve Industrial Enterprises's loan request, plaintiffs did not give up on the Matson transaction. Robert Conrad continued ordering materials for the chassis, although he placed the orders on hold pending resolution of the financial situation. He went to the Bank's offices in San Francisco in an unsuccessful attempt to reverse the denial of the loan. He contacted other banks but was unable to arrange financing. He unsuccessfully sought an advance payment from Matson. Eventually he returned to Burk and asked for a $125,000 loan. Burk refused that request. Conrad

asked Burk to cause the Bank to release the Uniform Commercial Code (UCC) security it held for Industrial Enterprises's existing debt but Burk refused.

On November 19, 1984, two bankruptcy petitions were filed under chapter 11. (11 U.S.C. § 1101 et seq. [reorganization].) One petition was on behalf of Industrial Enterprises as a corporate entity and the other was a joint petition on behalf of the Conrads personally. Although petitioners in bankruptcy are required to list all of their property, including "Contingent and unliquidated claims of every nature, including counterclaims of the debtor," neither Industrial Enterprises nor the Conrads listed a claim or counterclaim against the Bank in their petitions.

On September 3, 1985, the plaintiffs filed coordinated plans of reorganization. The Conrads' plan consisted of selling their commercial property. They anticipated that the proceeds from the sale of that property would be sufficient to satisfy the real estate loan secured by the first deed of trust held by the Bank; to satisfy Industrial Enterprises's debts that were secured by that property, including the Government Funding loan; and to satisfy their personal debts. They anticipated that the property could be sold within nine months, and asserted that they would revise the plan if the property had not been sold within that time. Industrial Enterprises's plan was dependent upon the completion of the Conrads' plan. It contemplated a significant reduction of its debt through the sale of the Conrads' commercial property. It intended to liquidate certain assets and to litigate a claim against K. B. Axle in order to further reduce its debt. Its remaining debt would be paid in monthly installments over a three-year period.

On December 23, 1985, the plaintiffs filed amended disclosure statements in support of creditor acceptance of their reorganization plans. The Conrads' statement did not disclose a claim against the Bank. Industrial Enterprises's statement included claims against K. B. Axle and AG Motors, and indicated that those claims would be pursued through trial, but did not identify a claim against the Bank. On February 5, 1986, the bankruptcy court entered orders confirming the reorganization plans, discharging all unlisted claims, and enjoining all creditors from seeking to enforce any claims except through the reorganization plans.

Following the confirmation of the reorganization plans, the Conrads remained in possession of the commercial property and continued to operate Industrial Enterprises from that location. The balance of the Bank's short-term, working-capital loan to Industrial Enterprises was paid and the Government Funding loan was reduced. However, although the Conrads continued making payments on the loan secured by a deed of trust to their

residence, they ceased making payments on the loan secured by the Bank's deed of trust on the commercial property. They also failed to sell the commercial property as required by their reorganization plans.

In May 1987, the Bank moved to dismiss the Conrads' bankruptcy proceeding or alternatively for relief from the portion of the reorganization plan that prohibited it from foreclosing its deed of trust to the commercial property. The Conrads objected to the Bank's request for dismissal or relief, but in doing so did not raise a potential claim against the Bank arising out of these transactions. However, on June 2, 1987, Robert Conrad filed a complaint against the Bank in the Sacramento County Superior Court. In that complaint Robert Conrad alleged that on September 25, 1984, the Bank promised to give Industrial Enterprises a short-term operating loan based on his personal guarantee, but that on September 26, 1984, and again on September 27, 1984, the Bank informed him that it would not make the loan. Conrad characterized this as fraud and misrepresentation and alleged that as a result he was forced to file a bankruptcy petition. A few days after that complaint was filed, on June 8, 1987, the bankruptcy court refused to dismiss the Conrads' bankruptcy petition but, over their objections, granted relief that permitted the Bank to foreclose on the commercial property.

On August 11, 1987, Robert Conrad filed a first amended complaint. In that complaint he identified himself as the debtor in possession in bankruptcy. He alleged that on September 25, 1984, the Bank falsely and fraudulently agreed to advance a short-term loan in the amount of $40,000 to Industrial Enterprises on the basis of his personal guarantee. Based upon this allegation he asserted causes of action for fraud and deceit by fiduciaries, constructive fraud and conspiracy to breach duties owed as a result of a confidential and fiduciary relationship, the intentional infliction of emotional stress [sic], and for injunctive relief to prevent foreclosure of the commercial property.

A second amended complaint was filed on September 25, 1987. On that occasion Barbara Conrad and Industrial Enterprises were added as plaintiffs and Burk was added as a defendant. The second amended complaint asserted causes of action for breach of contract; breach of the obligation of good faith; breach of the implied covenant of good faith and fair dealing; fraud and deceit by fiduciaries; constructive fraud and conspiracy to breach duties owed as the result of a confidential and fiduciary relationship; to impose a constructive trust over all items held by the Bank as security for loans; for injunctive relief to prevent foreclosure of the commercial property; and to quiet title to the commercial property on the ground that it was the Bank's wrongful conduct that caused default on the loan secured by the commercial property.

The defendants removed the action to the bankruptcy court. The plaintiffs filed a motion asking the bankruptcy court to remand the matter to state court or to abstain from hearing it. The defendants moved to dismiss. Without considering the motion to dismiss, the bankruptcy court recommended that the matter be remanded to state court and the federal district court adopted that recommendation. Upon remand to the Sacramento County Superior Court, the defendants successfully sought to transfer the case to the El Dorado County Superior Court.

In the meantime the Bank proceeded with foreclosure of the deed of trust on the commercial property. In January 1988, the Bank became the purchaser of that property at a trustee's sale.[4] The plaintiffs were served with notice to vacate the premises but they failed to do so. The Bank commenced an unlawful detainer action and eventually, in August 1988, the parties stipulated to a judgment that would allow the plaintiffs until September 29, 1988, to vacate the premises and which provided for removal of specified personal property. When, in October 1988, the plaintiffs had still failed to vacate the premises, the Bank secured their eviction through legal process pursuant to the stipulated judgment in the unlawful detainer action.[5]

In January 1989, the plaintiffs filed their third amended complaint. In that complaint they added Grumm as a defendant. That complaint asserted causes of action for fraud, fraudulent breach of fiduciary duties, breach of the implied covenant of good faith and fair dealing, and intentional interference with contract. The defendants demurred on various grounds, including the plaintiffs' failure to disclose their claims in their bankruptcy actions. (See

---

[4] In their respondent's brief, the defendants state that the Bank made a full credit bid of the outstanding balance and accrued interest on the secured loan. However, the trustee's deed reflects an outstanding debt of $350,389.85 and a bid of $306,000, leaving a deficiency of $44,389.85. Since the Bank chose to enforce its secured debt through a trustee's sale rather than through a judicial foreclosure action, it was precluded from seeking a deficiency judgment against the Conrads, but this was due to antideficiency legislation rather than through satisfaction of the debt by a full credit bid at the trustee's sale. (Code Civ. Proc., § 580d.)

[5] After the plaintiffs were evicted from the property they were allowed access to remove their personal property. The Bank asserted that the plaintiffs caused damage to the real property in removing their property and sought a damage award in the unlawful detainer action, pursuant to jurisdiction retained by virtue of the stipulated judgment. The municipal court awarded the Bank damages of approximately $12,000 and the Bank levied a writ of execution against the plaintiffs' bank account. The appellate department of the superior court concluded that damages had not been sought in the unlawful detainer complaint and reversed the damage award. The Bank amended its unlawful detainer complaint to seek damages and sought a writ of attachment. When a writ of attachment was denied the plaintiffs' funds were returned to them. Eventually the superior court consolidated this action with the Bank's claim for damages in the unlawful detainer action and, shortly before trial, the Bank dismissed its claim.

*Oneida Motor Freight, supra,* 848 F.2d 414.) The court sustained the demurrer without leave to amend as to Grumm, based on the statute of limitations. The court sustained the demurrer to the second cause of action without leave to amend based upon the absence of a fiduciary relationship. It sustained the demurrer to the third and fourth causes of action based upon the statute of limitations. The court granted plaintiffs leave to amend the first cause of action, based on fraud, as to the Bank and Burk. In doing so the court rejected the decision in *Oneida Motor Freight, supra.*

In May 1989, plaintiffs filed their fourth amended complaint setting forth one cause of action for fraud. The defendants were unsuccessful in their demurrer, motion for summary judgment, and motion for judgment on the pleadings on various grounds, including the principles of the *Oneida Motor Freight* decision, and the matter went to trial. The jury returned a verdict in favor of plaintiffs awarding them compensatory damages of $1,037,045 against the Bank and $262,955 against Burk, and further awarding punitive damages against the Bank in the sum of $1.3 million.

The Bank moved for judgment notwithstanding the verdict and, in the alternative, for a new trial. The trial court granted judgment notwithstanding the verdict based upon the decision in *Oneida Motor Freight* and the more recently rendered decision in *Hay* v. *First Interstate Bank of Kalispell, N.A.* (9th Cir. 1992) 978 F.2d 555. The plaintiffs appeal from the judgment notwithstanding the verdict.

## DISCUSSION

In *Oneida Motor Freight, supra,* 848 F.2d 414, the court affirmed the dismissal of a chapter 11 debtor's contract and tort action against the United Jersey Bank, a secured creditor. There Oneida Motor Freight and the bank had maintained a relationship that included a revolving credit agreement and an accounts receivable security agreement. When Oneida Motor Freight settled a legal dispute and asked the bank to satisfy the settlement through the revolving credit agreement, the bank instead withdrew the necessary funds from Oneida Motor Freight's operating account, thus causing the account to become habitually overdrawn. The bank honored Oneida Motor Freight's overdrafts for a time, but ceased doing so when it asked Oneida Motor Freight's owner to guarantee the corporation's debts and he refused. Oneida Motor Freight alleged that the bank's breach of their credit agreements and course of dealings, violation of its duty of good faith, and fraudulent misrepresentations were the catalyst for its chapter 11 bankruptcy petition. (848 F.2d at pp. 415-416.)

In Oneida Motor Freight's bankruptcy proceedings, from the time of its petition through the entry of an order confirming its plan of reorganization,

Oneida Motor Freight failed to list or refer to its claim against the bank. (848 F.2d at p. 416.) About seven months after confirmation of its reorganization plan, Oneida Motor Freight commenced a state court action against the bank. After commencing the state court action Oneida Motor Freight returned to the bankruptcy court to seek a modification of the reorganization plan to provide for a payment of a portion of the net recovery to its creditors. (*Id.* at p. 416, fn. 1.) Ultimately the bank removed the state court action to federal court and successfully sought dismissal. (*Id.* at p. 416.)

On Oneida Motor Freight's appeal, the court noted that "[a] long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights." (848 F.2d at p. 416.) The preparation and filing of a disclosure statement is a critical step in the reorganization of a chapter 11 debtor, and the debtor's express obligation of candid disclosure is the pivotal concept in a reorganization procedure. (*Id.* at p. 417.) A strong interest in finality pervades chapter 11 arrangements, and disclosure is important not only to a creditor charged with wrongdoing, but to other creditors and to the bankruptcy court. (848 F.2d at p. 417.) "It has been specifically held that a debtor must disclose any litigation likely to arise in a non-bankruptcy contest. [Citation.] The result of a failure to disclose such claims triggers application of the doctrine of equitable estoppel, operating against a subsequent attempt to prosecute the actions." (*Ibid.*) The court concluded that Oneida Motor Freight's reorganization plan was information-ally deficient and could not be cured by subsequent modification. The court noted that the original plan failed to alert creditors to the possible benefits inuring to them upon successful prosecution of the claim. The court assumed that revealing the potential claim could have had an impact on the bank's decisions with regard to establishing its lien and voting for confirmation. Finally, the court noted that successful prosecution would effectively require the bank to make restitution on the amount realized on its claim and would constitute a successful collateral attack on the bankruptcy court's order confirming the reorganization plan. The court concluded that failure to disclose the claim precluded Oneida Motor Freight from litigating it subse-quently. (*Id.* at p. 418.)

After concluding equitable estoppel was applicable and rejecting Oneida Motor Freight's claims that it was not required to disclose its claim, the federal appeals court also concluded that judicial estoppel barred the claim. Judicial estoppel looks to the connection between the litigant and the judicial system and applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. (848 F.2d at p. 419.) The court held that "Oneida's failure to list its claim against the bank

worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect. Although we stop short of finding that, as the bank urges, Oneida's prior silence is equivalent to an acknowledgment that it did not have a claim against the bank, we agree that its current suit speaks to a position clearly contrary to its Chapter 11 treatment of the bank's claim as undisputed." (*Ibid.*) The court rejected Oenida Motor Freight's claim that judicial estoppel was inapplicable because the claims were entirely different in view of its threshold assertion that the bank's conduct was the catalyst to the chapter 11 petition. (848 F.2d at pp. 419-420.)

In summary, the *Oneida Motor Freight* court applied equitable estoppel and judicial estoppel to find a lender liability action barred by chapter 11 bankruptcy proceedings in which the debtor failed to identify the claim.

While sometimes expressing the rule differently, the various federal courts of appeals that have considered the matter have consistently adhered to the basic rule set forth in *Oneida Motor Freight.* Thus, in the *Matter of Howe* (5th Cir. 1990) 913 F.2d 1138, 1143-1147, the court held a lender liability action to be barred by res judicata, noting a long-standing rule that confirmation of a reorganization plan is binding upon all parties and with respect to all issues that could have been raised pertaining to such plan. In *Sure-Snap Corp.* v. *State Street Bank and Trust Co.* (2d Cir. 1991) 948 F.2d 869, 873-877, the court held that confirmation of a reorganization plan barred later litigation of a lender liability action against a creditor by reason of res judicata. In *Sanders Confectionery Products* v. *Heller Financial* (6th Cir. 1992) 973 F.2d 474, 479-485, the court held that an order confirming a plan of reorganization is a final judgment for res judicata purposes and that a debtor's parent corporation and its officers were precluded from pursuing lender liability claims that should have been raised in the bankruptcy proceedings. In *Eubanks* v. *F.D.I.C.* (5th Cir. 1992) 977 F.2d 166, 169-174, the court held that res judicata barred a debtor and his wife from pursuing lender liability claims that were not addressed in the debtor's disclosure statement and reorganization plan.

The Ninth Circuit Court of Appeals addressed the issue in *Hay* v. *First Interstate Bank of Kalispell, N.A., supra,* 978 F.2d at pp. 556-557, upon which the trial court relied. There, in a rather terse opinion, the court held that the debtor had sufficient information to require it to notify the bankruptcy court of the existence of the claim and concluded: "Failure to give the required notice estops [the debtor] and justifies the grant of summary judgment to the defendants." With respect to the plaintiff's claim that the equities favored prosecution of the action for benefit of creditors whose shares of the estate would be enhanced, the court said: "We understand

but reject the argument." Finally, in *Payless Wholesale Distrib.* v. *Alberto Culver* (1st Cir. 1993) 989 F.2d 570, a chapter 11 debtor and associated plaintiffs filed a complaint purporting to set forth 20 causes of action for statutory, contractual and tortious wrongs. The court noted that in connection with a chapter 11 petition there are requirements to give reasons for filing and to list all assets, including claims and causes of action. Since the plaintiffs claimed that the defendants' actions were a cause of the bankruptcy, "[e]ven a cursory examination of the claims shows that defendants should have figured in both aspects of the Chapter 11 proceedings, . . ." (989 F.2d at p. 571.) In view of the long-accepted nature of a debtor's obligations in a chapter 11 proceeding, "[n]othing more need be said." (*Id.* at p. 572.)

This rule, which we may refer to as the *Oneida Motor Freight* rule, is specific to the circumstances presented, namely, where a chapter 11 debtor fails to list or otherwise identify a claim against a creditor during the proceedings leading up to confirmation of a reorganization plan.[6] In this context the federal courts have rejected various attempts to distinguish and/or excuse such failures. Thus, in *Oneida Motor Freight, supra,* 848 F.2d at page 419, the court said: "Although Oneida may be technically correct in its argument that it was never *procedurally* compelled to raise its claim, we are satisfied that its failure to mention this potential claim either within the confines of its disclosure statement or at any stage of the bankruptcy court's resolution precludes this later independent action. Even absent a specific mandate to file a counterclaim, complete disclosure is imperative to assist interested parties in making decisions relevant to the bankrupt estate." In *Sure-Snap Corp.* v. *State Street Bank and Trust Co., supra,* 948 F.2d at pages 874-875, the court held that for res judicata purposes a "bankruptcy cause of action" must be construed broadly to encompass not just the creditors' proofs of claim but the debtor's petition for protection from creditors as well, thus including all of the remedial rights of the debtor against the creditor arising out of the relevant transaction. In *Sanders Confectionery Products* v. *Heller Financial, supra,* 973 F.2d at page 484, the court rejected an argument that the rule should apply only to compulsory counterclaims and held that what is important is not whether a claim is compulsory, but whether it should have been considered in the prior proceedings.

In different contexts some federal courts have held that decisions in bankruptcy cases act as a bar only with respect to "core proceedings." (See

---

[6]The rule was applied to a chapter 7 (liquidation) debtor in *Matter of Baudoin* (5th Cir. 1993) 981 F.2d 736, 739-744. There the creditor/defendant sought to enjoin the debtor from maintaining a state court lender liability action and, applying res judicata, the appellate court remanded to the district court for appropriate injunctive or other relief. We are here concerned with chapter 11 proceedings and will focus our discussion on the rule with respect to chapter 11 debtors.

*Barnett* v. *Stern* (7th Cir. 1990) 909 F.2d 973, 979 [bankruptcy trustee not precluded from pursuing RICO (Racketeer Influenced and Corrupt Organizations Act) claim against son of debtor]; *Howell Hydrocarbons, Inc.* v. *Adams* (5th Cir. 1990) 897 F.2d 183, 189-190 [creditor not precluded from pursuing RICO action against principals of debtor's parent corporation who were not parties to bankruptcy action].) The definition of a "core proceeding" is vague. (See 28 U.S.C. § 157(b)(2); *Howell Hydrocarbons, Inc.* v. *Adams*, *supra*, 897 F.2d at pp. 189-190.)[7] But in any event, in *Sanders Confectionery Products* v. *Heller Financial*, *supra*, 973 F.2d at pages 482 and 483, the court specifically rejected the core/noncore distinction in the application of the *Oneida Motor Freight* rule. And the Fifth Circuit Court of Appeals, the circuit that rendered the decision in *Howell Hydrocarbons, Inc.* v. *Adams*, *supra*, 897 F.2d 183, subsequently rendered the decisions in the *Matter of Howe*, *supra*, 913 F.2d 1138 and *Eubanks* v. *F.D.I.C.*, *supra*, 977 F.2d 166, in which it applied the *Oneida Motor Freight* rule to related matters without limiting the rule to core proceedings.[8]

■ The plaintiffs assert that these authorities represent the view of intermediate federal courts and may be rejected by this court. We do not agree that these authorities may be so cavalierly disregarded. What is at issue here is the effect to be accorded the plaintiffs' bankruptcy proceedings in subsequent litigation with their creditors. It is a well-settled rule that the effect to be accorded a judgment is determined by the law of the jurisdiction in which it was rendered. (*Gagnon Co., Inc.* v. *Nevada Desert Inn* (1955) 45 Cal.2d 448, 454 [289 P.2d 466]; *Krofcheck* v. *Ensign Co.* (1980) 112 Cal.App.3d 558, 564 [169 Cal.Rptr. 516]; *Thorley* v. *Superior Court* (1978) 78 Cal.App.3d 900, 906 [144 Cal.Rptr. 557].) We must give full faith and credit to final orders and judgments of a federal court and thus such an order has the same effect in the courts of this state as it would have in a federal court. (*Levy* v. *Cohen* (1977) 19 Cal.3d 165, 172-173 [137 Cal.Rptr. 162, 561 P.2d 252]; *Martin* v. *Martin* (1970) 2 Cal.3d 752, 761 [87 Cal.Rptr. 526, 470

---

[7]The "core proceeding" concept had its genesis in *Northern Pipeline Co.* v. *Marathon Pipe Line Co.* (1982) 458 U.S. 50 [73 L.Ed.2d 598, 102 S.Ct. 2858], in which the high court held that it was unconstitutional for Congress to vest article III judicial powers in bankruptcy judges. Although the court failed to render a majority opinion, a plurality opinion suggested that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power" could be vested in bankruptcy courts. (458 U.S. at p. 71 [73 L.Ed.2d at p. 615].) Congress responded by vesting bankruptcy courts with the power to hear and determine core proceedings, and to hear related noncore proceedings but requiring submission of proposed findings of fact and conclusions of law to the district court for determination and entry of any final order or judgment. (28 U.S.C. § 157.) Congress provided a nonexclusive list of matters that constitute core proceedings, but did not otherwise define the concept. (28 U.S.C. § 157(b)(2).)

[8]In any event, as we shall explain, plaintiffs' claim, reduced to its essentials, was a core proceeding within the meaning of the bankruptcy laws.

P.2d 662]; *People* v. *Rath Packing Co.* (1978) 85 Cal.App.3d 308, 323 [149 Cal.Rptr. 431].)

This rule is applicable to bankruptcy proceedings. (*Levy* v. *Cohen, supra,* 19 Cal.3d at p. 172; *Martin* v. *Martin, supra,* 2 Cal.3d at p. 761.) Indeed, it must have particular application with respect to bankruptcy. Federal authority with respect to bankruptcy is established in the Constitution, which grants Congress the power to establish uniform laws on the subject of bankruptcies throughout the United States. (U.S. Const., art. I, § 8.) This provision requires that the scope and effect of bankruptcy be uniform throughout the nation, and expressly prohibits a bankruptcy system in which a bankruptcy can mean one thing in one place and something else in another place, depending upon local law. (*Perez* v. *Campbell* (1971) 402 U.S. 637, 656 [29 L.Ed.2d 233, 246, 91 S.Ct. 1704].) Pursuant to the supremacy clause we must defer to federal law in determining the effect to be accorded plaintiffs' bankruptcy proceedings. (*Id.* at p. 649 [29 L.Ed.2d at p. 242].)

It has been said that, with the exception of the decisions of the United States Supreme Court, the decisions of federal courts are not binding on the courts of this state even with respect to federal issues. (*Rohr Aircraft Corp.* v. *County of San Diego* (1959) 51 Cal.2d 759, 764 [336 P.2d 521]; *Alicia T.* v. *County of Los Angeles* (1990) 222 Cal.App.3d 869, 879 [271 Cal.Rptr. 513]; *Debtor Reorganizers, Inc.* v. *State Bd. of Equalization* (1976) 58 Cal.App.3d 691, 696 [130 Cal.Rptr. 64].) However, on questions of federal law, decisions of the lower federal courts are entitled to great weight. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129]; *Debtor Reorganizers, Inc.* v. *State Bd. of Equalization, supra,* 58 Cal.App.3d at p. 696.) And generally a refusal to adhere to federal precedent occurs where federal decisions provide scant authority for the proposition urged or are divided on an issue. (See *Rohr Aircraft Corp.* v. *County of San Diego, supra,* 51 Cal.2d at pp. 764-765 [rejecting a single trial court (F.Supp) decision]; *Alicia T.* v. *County of Los Angeles, supra,* 222 Cal.App.3d at p. 879 [federal authorities conflicting].) We should be hesitant to reject the authority of federal decisions on questions of federal law where those decisions are both numerous and consistent.

In any event, our task here is not to interpret a statute or to determine what the law should be. Rather, since we should give the same effect to plaintiffs' bankruptcy proceedings as would be accorded in federal court, our inquiry is simply what effect the federal courts would accord to those proceedings. The federal authorities we have cited above establish the effect that federal courts give to bankruptcy proceedings and we discern no reason why we should depart from the settled federal rule.

Finally, we note that our conclusion that the *Oneida Motor Freight* rule is applicable is consistent with the recently published decision of the Sixth Appellate District in *Billmeyer* v. *Plaza Bank of Commerce* (1995) 42 Cal.App.4th 1086 [50 Cal.Rptr.2d 119].[9] In that case the plaintiff had failed to list or identify lender liability claims, or to dispute the lender's secured and unsecured claims in a bankruptcy action that was commenced as a reorganization action under chapter 11 and then converted to a liquidation proceeding under chapter 7 before a reorganization plan was approved. The Court of Appeal noted that while the issue-preclusion terminology that is employed is variable, it appears to be a universal rule that the failure to disclose a potential lender liability claim in a bankruptcy action precludes subsequent prosecution of such an action. (42 Cal.App.4th at p. 1091.) The court rejected the bankruptcy debtor's contention that there was no final judgment in the bankruptcy action, concluding that the proceedings to terminate the automatic stay and to give the creditor security interests in postpetition assets were matters in which the lender liability claims could have and should have been raised. (*Id.* at pp. 1093-1094.) The court also rejected the following contentions that are asserted by the plaintiffs here: (1) that the failure to disclose the lender liability claims could be cured by petitioning to reopen the bankruptcy case to obtain that court's approval of the employment of an attorney to pursue the lender liability claims (*ibid.*); (2) that preclusion under the *Oneida Motor Frieght* rule does not apply if pursuit of the lender liability claim would benefit creditors of the bankrupt or unless it appears that the bankruptcy debtor was attempting to gain an advantage by concealment of the claim (*id.* at p. 1096); and (3) that invocation of the *Oneida Motor Freight* rule requires a showing of detrimental reliance or prejudice to the defendant creditor (*id.* at p. 1096, fn. 8). While it does not appear that the *Oneida Motor Freight* rule was a matter of state law, that court's recognition of the universal application of the rule is consistent with our own research and supports our decision to decline to stand alone in rejection of the rule.

▆ Plaintiffs' attempts to distinguish this case from those we have cited are unavailing. They assert that the record does not establish that they knew they had a claim against the Bank when they filed their bankruptcy schedules. Similar assertions have been rejected in the federal decisions we have cited. (*Hay* v. *First Interstate Bank of Kalispell, N.A.*, *supra*, 978 F.2d at p. 557 ["We recognize that *all* facts were not known to Desert Mountain at that

---

[9]The decision in *Billmeyer* was filed by the Court of Appeal on April 17, 1995, and the jurisdictional periods for rehearing and for review by the Supreme Court have since expired. The decision in that case was not certified for publication by the Court of Appeal. However, on recommendation of the Court of Appeal pursuant to California Rules of Court, rule 978, the Supreme Court directed publication of the decision by order filed February 15, 1996.

time, but enough was known to require notification of the existence of the asset to the bankruptcy court."]; *Eubanks* v. *F.D.I.C., supra*, 977 F.2d at p. 174; *Matter of Howe, supra*, 913 F.2d at p. 1147.) The record establishes that plaintiffs were fully aware of the operative facts surrounding their claims against the Bank and Burk and at best it could be said that they may not have been aware of the legal significance of those facts. However, that is not an excuse for failing to identify the claim in the earlier proceedings. (*Ibid.*)

Plaintiffs assert that the record fails to establish that they intended for the defendants to rely on their omission. However, reliance by creditors is the whole point of the disclosures required in a reorganization proceeding, and disclosure has been described as the central concept in a reorganization procedure.[10] "The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" (*Oneida Motor Freight, supra*, 848 F.2d at p. 417.)

Plaintiffs argue that the defendants were aware of their own conduct and thus cannot assert that they were unaware of the true facts. In making this argument the plaintiffs point to the wrong "true facts." The issue is whether the defendants, and for that matter other creditors and the bankruptcy court, were aware that plaintiffs had or would attempt to make a claim against the defendants. On the record it is clear that the defendants were not aware that plaintiffs would assert lender liability claims against them until long after confirmation of the reorganization plans.

Plaintiffs assert that there is no evidence the defendants detrimentally relied on their omission. "The basic principle of bankruptcy is to obtain a discharge from one's creditors in return for all one's assets, except those exempt, as a result of which creditors release their own claims and the bankrupt can start fresh." (*Payless Wholesale Distrib.* v. *Alberto Culver, supra*, 989 F.2d at p. 571.) Creditors are required to make their claims, if at

[10]"The premise underlying Chapter 11 is disclosure, and a central theme of plan confirmation under Chapter 11 is court approval of a disclosure statement under 11 USCS § 1125. Transmittal of a disclosure statement to holders of claims or interests and court approval of the statement are prerequisites to the postpetition solicitation of acceptance or rejection of a plan by those holders of claims or interests. In addition, the submission of an approved disclosure statement, together with the plan itself and ballots to vote to accept or reject the plan, is a prerequisite to the commencement of a plan confirmation hearing, and disclosure statement approval is a statutorily required step in obtaining confirmation of a Chapter 11 plan. [¶] The disclosure statement is intended to serve as a primary source of formal and uniform information about the debtor's condition, in order to enable each participant to make an informed judgment as to whether to accept or reject the proposed plan." (9B Am.Jur.2d, Bankruptcy, § 2426, pp. 209-210, fns. omitted.)

all, in the bankruptcy proceeding, their consent is required for confirmation of a reorganization plan, and upon plan confirmation they are precluded from asserting claims except to the extent and in the manner approved in the reorganization plan. Under similar circumstances the court in *Oneida Motor Freight, supra*, 848 F.2d at page 418, said: "We can assume that revealing the potential action may also have impacted upon the bank's decision to enter into the stipulation establishing the extent and validity of its lien against Oneida and to vote for confirmation. The practical effect of a successful prosecution of Oneida's claim would be to require the bank to make restitution of the amount realized on its bankruptcy claim, since Oneida's present action calls into question the bank's right to collect its secured debt. This would also constitute a successful collateral attack on the bankruptcy court's order confirming the reorganization plan." The Bank's participation in the bankruptcy action and its consent to the reorganization plans, and the debt collection forbearance it thus accepted, are sufficient detrimental reliance under *Oneida Motor Freight.*

Plaintiffs assert that a significant distinguishing factor here is that as a result of their subsequent action against the Bank, all of their creditors will be fully paid. First, this is not true. The Bank was a creditor in each of the bankruptcy proceedings and the Bank presented, established, and pursued recovery on its claims in accordance with the rules and procedures of the bankruptcy laws. As the court in *Oneida Motor Freight* noted, to permit plaintiffs to recover in a subsequent action would have the practical effect of requiring the Bank to make restitution of the amounts it realized on its bankruptcy claims. (848 F.2d at p. 418.) Thus, the Bank would not be fully paid on the claims it established in the bankruptcy proceedings. Second, such a result would constitute a successful collateral attack on the bankruptcy court's orders. (*Ibid.*) And the federal courts have consistently held that result may not be permitted regardless whether the other creditors would thereby receive more on their claims.

In any event, these assertions of plaintiffs are based upon their assumption that the defendants were required to establish the elements of traditional equitable estoppel under state law. However, we are not here concerned with the requirements for a showing of equitable estoppel under state law; rather, we are concerned with the scope and effect that federal courts would accord to the confirmation of plaintiffs' reorganization plans by the bankruptcy court. In *Payless Wholesale Distrib.* v. *Alberto Culver, supra*, 989 F.2d at page 571, the court noted that the *Oneida Motor Freight* rule "may not be strictly equitable estoppel," but concluded that the rule is necessary to prevent unacceptable abuse of judicial proceedings. In applying the rule various federal courts have cited principles of equitable estoppel, judicial

estoppel, and res judicata, but they have been consistent in adhering to the result in *Oneida Motor Freight*. Based upon the federal authorities we have cited, it is clear that under federal law the confirmation of plaintiffs' reorganization plans is a bar to the subsequent prosecution of this lender liability action.

During the pendency of this appeal we granted the plaintiffs' request that we take judicial notice of certain records of the bankruptcy court.[11] Those materials reflect that on March 8, 1991, after plaintiffs filed their fourth amended complaint in this action and shortly before defendants' motion for summary judgment on that complaint, the bankruptcy court entered orders in each of the bankruptcy proceedings approving the employment of an attorney to prosecute this action. On May 14, 1992, before trial of this action, the bankruptcy court entered an order dismissing the Conrads' joint bankruptcy proceeding on their motion. After trial of this action and after entry of judgment notwithstanding the verdict, Industrial Enterprises moved to modify its reorganization plan postconfirmation. The bankruptcy court concluded that the Bank lacked standing to object and entered an order providing for the division of any net recovery by Industrial Enterprises on this claim.

Plaintiffs argue that the judgment notwithstanding the verdict must be reversed and the jury verdict reinstated because the bankruptcy court's orders approving employment of an attorney and modification of Industrial Enterprises's reorganization plan effectively cured the failure to earlier identify their claims. They assert that in fact the order approving modification of Industrial Enterprises's plan is entitled to res judicata effect in this appeal and mandates reversal of the judgment notwithstanding the verdict.

We reject these arguments. First, this argument was squarely rejected in *Oneida Motor Freight*, *supra*, 848 F.2d at page 418, where the debtor, in a far more timely manner, obtained modification of its reorganization plan but the court held that the modification did not cure the failure to identify the claim in the original plan. Second, under the circumstances here the bankruptcy court lacked jurisdiction over the merits of this dispute. As the authorities we have cited establish, this matter could have been and in fact should have been presented or at least identified to the bankruptcy court in the first instance. However, plaintiffs failed to raise the issue in the original bankruptcy proceedings and later successfully resisted the defendants' efforts to remove the matter to the bankruptcy court. Accordingly, this court

---

[11]Subsequent to plaintiffs' motion, respondents moved that we take judicial notice of the transcript of the bankruptcy court hearing on plaintiffs' motion to modify Industrial Enterprises' reorganization plan. We deferred ruling on that motion, and we now grant it.

has jurisdiction over the merits of the claim and the bankruptcy court does not. Under these circumstances it would be patently absurd for the bankruptcy court to refuse a debtor's belated request to modify a reorganization plan so that any recovery the debtor might obtain would be available for unpaid bankruptcy creditors. However, such a modification order must necessarily be contingent upon the debtor obtaining a recovery and that possibility remains subject to the defense established in *Oneida Motor Freight* and its progeny. (*Oneida Motor Freight, supra,* 848 F.2d at p. 418; see also *Sure-Snap Corp.* v. *State Street Bank and Trust Co., supra,* 948 F.2d at pp. 872-873; *Matter of Howe, supra,* 913 F.2d at p. 1141.)[12]

While we find the *Oneida Motor Freight* rule to be applicable, it is appropriate at this point in our discussion to address briefly the merits of plaintiffs' claim. There are three reasons for this. First, plaintiffs assert that the defendants have been proven to be guilty of fraud and that their fraud should preclude them from relying on equitable defenses, including the *Oneida Motor Freight* rule. Second, although the federal courts have been consistent in adhering to the *Oneida Motor Freight* result, the reasoning they have employed has varied and at least some of those courts have indicated that particular cases may arise in which the circumstances warrant rejection of the *Oneida Motor Freight* result. (See *Matter of Howe, supra,* 913 F.2d at p. 1147.) Obviously the determination whether this is such a case would require consideration of the specific cause of action shown. Finally, consistent with Code of Civil Procedure section 906,[13] the defendants assert that the absence of sufficient evidence to support the verdict establishes that plaintiffs were not prejudiced by the entry of judgment notwithstanding the verdict even if the *Oneida Motor Freight* rule does not apply.

The sole cause of action upon which this case went to trial was alleged fraud based upon the claim that the defendants falsely promised to make a

---

[12]In fact, the bankruptcy court's ruling on the request for modification of the reorganization plan was contingent and did not purport to rule on the merits of this action. Thus, the court provided for the utilization of any recovery obtained, but also made provision for the possibility Industrial Enterprises would be unsuccessful in realizing any recovery. We fail to see how such a contingent order could be considered determinative of the issue presented here.

[13]Since judgment notwithstanding the verdict was entered in defendants' favor, they could not file an immediate cross-appeal and could pursue their own appeal only after entry of judgment on remand in the event of reversal of the judgment notwithstanding the verdict. (*Lippert* v. *AVCO Community Developers, Inc.* (1976) 60 Cal.App.3d 775, 779 [131 Cal.Rptr. 730].) However, Code of Civil Procedure section 906 provides, in relevant part: "The respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review any of the foregoing matters for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken."

loan to Industrial Enterprises in September 1984. ■ "Fraud is an intentional tort, the elements of which are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Cicone* v. *URS Corp.* (1986) 183 Cal.App.3d 194, 200 [227 Cal.Rptr. 887]; see also Civ. Code, §§ 1709-1710; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778.) Fraud is a charge that is easily made but less often substantiated. In order to establish a cause of action for fraud a plaintiff must plead and prove in full, factually and specifically, all of the elements of the cause of action. (*Wilhelm* v. *Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1331 [231 Cal.Rptr. 355].) General and conclusory claims of fraud will not suffice. (*Ibid.*; see also 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 662, p. 111.)

**(4b)** We find several deficits in plaintiffs' evidentiary showing. The first element of fraud is a misrepresentation. Here the misrepresentation was Burk's alleged promise to approve a loan to Industrial Enterprises. The alleged promise was oral and, other than Robert Conrad, there were no witnesses and no documentary evidence to establish such a promise. Robert Conrad's testimony with respect to the promise was vague. He testified that in early September, shortly after he learned that AG Motors would not go forward with the joint venture, he told Burk that Industrial Enterprises might need some loans and that it intended to go forward utilizing liquid assets and that kind of thing before talking to Burk about loans. Burk reportedly said, "No problem." That exchange establishes nothing more than a willingness to consider future loan applications and does not establish a fraudulent promise to make a loan. (See *Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 59 [248 Cal.Rptr. 217].)

The purported promise to make a loan occurred later in the month. Robert Conrad testified that during the week of September 17th, he told Burk he would need an initial $40,000 loan, to be used in part to pay Industrial Enterprises's existing indebtedness and in part for the October 5th payroll. He testified that Burk agreed to process the loan application and said he would comply, which Conrad understood to mean he would make the loan. Each element of a cause of action for fraud must be shown with specificity. (*Wilhelm* v. *Pray, Price, Williams & Russell*, *supra*, 186 Cal.App.3d at p. 1331.) Robert Conrad's understanding or expectation that the Bank would extend a loan is not sufficient to establish an agreement to make a loan. (*Kruse* v. *Bank of America*, *supra*, 202 Cal.App.3d at p. 59.) And his testimony is otherwise lacking in specificity.

■■ In any event, a claim of fraud cannot be permitted to serve simply as an alternative cause of action whenever an enforceable contract is

not formed. Accordingly, in order to support a claim of fraud based upon the alleged failure to perform a promise, it must be shown that the promisor did not intend to perform at the time the promise was made. (*Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 30 [216 Cal.Rptr. 130, 702 P.2d 212].) Although it has been suggested that failure to perform a promise is sufficient to prove fraud, "[t]his is not, and has never been the law," and "if plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he [should] never reach a jury." (*Id.* at pp. 30-31.) On the record presented we find insufficient evidence to support the claim that Burk promised to approve a loan to Industrial Enterprises knowing that the loan would not be made.

■ In addition to showing that the defendant knowingly made a false representation, in order to establish fraud it must be shown that the defendant thereby intended to induce the plaintiff to act to his detriment in reliance upon the false representation. (Civ. Code, § 1709; *Bell* v. *Renaldo* (1975) 51 Cal.App.3d 779, 781 [124 Cal.Rptr. 233].) The defendant must intend to induce a particular act of the plaintiff and is not liable in fraud for unintended consequences. (*Carlson* v. *Murphy* (1935) 8 Cal.App.2d 607, 611 [47 P.2d 1100].) And it must be shown that the plaintiff actually and justifiably relied upon the defendant's misrepresentation in acting to his detriment. (*Spinks* v. *Clark* (1905) 147 Cal. 439, 444 [82 P. 45]; *Wilhelm* v. *Pray, Price, Williams & Russell, supra*, 186 Cal.App.3d at p. 1332.)

■ Plaintiffs' claims founder on the required showing that the defendants' false promise was intended to and did induce detrimental reliance. In Robert Conrad's testimony with respect to the conversation with Burk during the week of September 17th, he said that he understood Burk to have agreed to approve a loan but he did not identify anything Burk asked in return for such a promise. We have considered the record to identify potential candidates for detrimental reliance by plaintiffs but find none of the candidates sufficient to support a cause of action for fraud.

Robert Conrad testified that a few days after the conversation with Burk in which he agreed to make a loan to Industrial Enterprises, Burk asked him to obtain a new assignment of proceeds from Matson to reflect the new purchase order. By letter dated September 24, 1984, Industrial Enterprises forwarded an updated assignment of proceeds to Matson for execution. That act cannot support a cause of action for fraud for several reasons. First, an updated assignment of proceeds would not represent a change of position of the parties. It was established, and plaintiffs conceded, that the Bank's existing security agreement and assignment of proceeds entitled the Bank to the proceeds of any sale to Matson so long as it was owed money by

Industrial Enterprises. Second, Conrad's testimony was that the new assignment was a requirement Burk imposed upon the expected loan. Where a prospective lender imposes requirements upon the making of a loan it obviously must make the loan in order to obtain the benefit of the requirements. It would be anomalous to conclude that Burk made a short-lived false promise in order to induce reliance that would be meaningless unless the promise was kept. Third, from the record it is clear that at least by the morning of September 26th, the Bank unequivocally told plaintiffs that the loan would not be made. That was before the Bank could have received a new assignment of proceeds from Matson and there was no evidence that it later received a new assignment of proceeds. Thus, there was no evidence of actual detriment to plaintiffs in this respect. Finally, this matter involves the Bank's security interests and preferences and was unquestionably a "core proceeding" under bankruptcy law (see 28 U.S.C. § 157(b)(2)), and under any reading of federal law, had to be presented, if at all, in the bankruptcy proceedings.[14]

At trial plaintiffs asserted that Burk made a false promise to approve a loan so that they would allow the Bank to use proceeds from a prior Matson purchase to pay down their existing loan balance. That assertion does not support a claim of fraud. It was established that the Bank had an existing security agreement with Industrial Enterprises that gave it the right to use the Matson proceeds as payment for its existing loans. Moreover, in early August when the prior loans matured and the payments which had been earmarked for payment were received, Burk agreed to let the funds "pass through" to Industrial Enterprises and to look to the Matson receivables for payment of the Bank's loans. Plaintiffs agreed to dedicate the Matson receivables for payment of the loans and Robert Conrad noted that agreement in a letter to the Bank on August 7, 1984. Thus, well before the alleged promise of a loan, the Bank had the legal right to use the Matson proceeds for payment of its loans and plaintiffs had no legal right to prevent that procedure. In any event, even if we assumed that the application of the Matson proceeds to the existing loans was somehow wrongful or fraudulent, that matter would certainly be a core proceeding under the bankruptcy laws (28 U.S.C. § 157(b)(2)), and would be precluded by plaintiffs' failure to

---

[14]Although the federal authorities we have cited in connection with the *Oneida Motor Freight* rule reject the core/noncore dichotomy as determinative in the specific circumstances in which a chapter 11 debtor attempts to pursue a claim that was not listed or identified to the bankruptcy court before confirmation of a reorganization plan, as we have previously noted in other contexts, some federal courts have found the core/noncore distinction important in considering the res judicata effect of a bankruptcy proceeding. (See *Barnett* v. *Stern, supra*, 909 F.2d at p. 979; *Howell Hydrocarbons, Inc.* v. *Adams, supra*, 897 F.2d at pp. 189-190.) But we have found no cases that suggest that an order confirming a reorganization plan is not preclusive with respect to what are clearly core proceedings.

raise it in the bankruptcy proceedings regardless of the specific authority of the *Oneida Motor Freight* line of authorities.

At trial Robert Conrad was asked what Industrial Enterprises did in reliance on Burk's promise to make a loan and he said that they "cut purchase orders" for materials for the Matson order that should have been ordered by AG Motors. However, of the thirteen purchase orders put into evidence, eight were dated in early September, before the alleged promise to make a loan, and four were dated September 27, after plaintiffs had been unequivocally told that a loan would not be extended. Only one evidentiary purchase order was dated in the interim between the alleged promise and the refusal to make the loan, and that purchase order reflects that it was confirming an earlier order pursuant to which the initial shipment had been received before the alleged promise. It is apparent that these purchase orders could not have been issued in reliance on Burk's alleged short-lived promise of a loan. Moreover, the record reflects that when plaintiffs could not arrange financing, they placed the purchase orders on hold with the various manufacturers and thus did not actually incur liabilities with respect to those orders.[15]

 Finally, we find a deficit in proof of the final element of a cause of action for fraud, actual damage resulting from reliance on the defendant's misrepresentation. (*Agnew* v. *Parks* (1959) 172 Cal.App.2d 756, 768 [343 P.2d 118].) Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages. (*Gonsalves* v. *Hodgson* (1951) 38 Cal.2d 91, 101 [237 P.2d 656]; *Hull* v. *Sheehan* (1952) 108 Cal.App.2d 804, 805 [239 P.2d 704].) And the damages suffered must be referable to, and caused by, the fraud. (*Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 490-491 [275 P.2d 15]; *Gonsalves* v. *Hodgson, supra*, 38 Cal.2d at p. 101.)

In this case plaintiffs' discussions with Burk did not reach the point of becoming a contractually binding loan agreement. (See *Banco Do Brasil, S.A.* v. *Latian, Inc.* (1991) 234 Cal.App.3d 973, 1015, fn. 55 [285 Cal.Rptr.

---

[15]That plaintiffs did not actually suffer detriment as the result of the evidentiary purchase orders is established by three factors: First, in their correspondence with Matson after being told that the Bank would not make a loan, the plaintiffs advised that they had put their materials orders on hold pending their attempts to obtain financing. Second, of the various material suppliers reflected in the evidentiary purchase orders, only one was listed as a creditor in Industrial Enterprises's bankruptcy schedules. That creditor was Ahmsa Steel International, Inc., with a claim of $7,660, which corresponds to the shipment received before Burk's alleged promise and that was reflected in the purchase order dated September 25, 1984. Third, although Robert Conrad said that plaintiffs "cut purchase orders," they presented no evidence to show that they actually incurred liabilities as a result of those purchase orders.

870]; *Price* v. *Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 483 [261 Cal.Rptr. 735]; *Kruse* v. *Bank of America, supra*, 202 Cal.App.3d at pp. 59-60.) Thus, the Bank was not under any legal or contractual obligation to make a loan to plaintiffs in September 1984. The plaintiffs did not go to trial on a breach of contract claim, but instead complained of an alleged false promise by Burk to cause the Bank to enter into a loan contract with them. However, their claimed damages all related to their inability to obtain a loan rather to than any detriment caused by Burk's alleged short-lived promise of loan approval.[16] In short, the record does not establish that plaintiffs were in any different, or worse, position as a result of Burk's promise to make a loan than they would have been had Burk adamantly refused to approve a loan when Robert Conrad spoke to him during the week of September 17th. Plaintiffs failed to show damage specifically attributable to the short-lived promise of a loan and accordingly failed to establish a cause of action for fraud based upon that promise.

In summary, we find the rule expressed in *Oneida Motor Freight* and its progeny to be a bar to plaintiffs' claim for fraud since they failed to list or otherwise identify the claim in their bankruptcy proceedings up to and through the time the bankruptcy court issued orders confirming their reorganization plans. We have considered and rejected plaintiffs' attempts to distinguish their case for purposes of application of that rule. We have considered and found the evidence insufficient to support a cause of action for fraud with the results that (1) assuming proof of fraud would preclude defendants from relying on the *Oneida Motor Freight* rule, plaintiffs have failed to prove such fraud; (2) to the extent federal authorities suggest there may be exceptions to the *Oneida Motor Freight* rule, we find no occasion to determine the nature of those exceptions; and (3) even if we were to reject the *Oneida Motor Freight* rule, we would find no prejudice from the trial court's reliance on that rule since defendants were entitled to a judgment in their favor based upon the lack of substantial evidence to support plaintiffs' claim of fraud.

---

[16]In this respect, as in others, plaintiffs sought to pursue a claim that clearly involved a core proceeding under bankruptcy law. At trial a major component of the damages plaintiffs sought, and a major portion of their effort to put the defendants in a bad light in the eyes of the jury, consisted of their complaints over the loss of their commercial property through foreclosure of the Bank's deed of trust. But the foreclosure followed the presentation and confirmation of the Bank's claim and security interest by the bankruptcy court, a delay of several years before foreclosure due to the bankruptcy proceedings and confirmation of the reorganization plans, and a contested hearing in which the bankruptcy court approved foreclosure in view of the plaintiffs' failure to complete their reorganization plans. The foreclosure unquestionably involved core proceedings and plaintiffs' claim for recompense based on the foreclosure was precluded even if the *Oneida Motor Freight* rule were otherwise inapplicable.

DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Morrison, J., concurred.

A petition for a rehearing was denied on May 7, 1996, and the following opinion was then rendered:

**SPARKS, J.**—Plaintiffs petition for rehearing asserting, in part, that a recent decision of the federal court of appeals casts doubt on our application of what we have called the *Oneida Motor Freight* rule. In *Ryan Operations G. P. v. Santiam-Midwest Lumber Co.* (3d Cir. 1996) 81 F.3d 355 [Dock. No. 95-3250], the court of appeals for the same circuit that rendered the *Oneida Motor Freight* decision held that judicial estoppel did not preclude the plaintiff from pursuing warranty actions against suppliers of defective materials that were not parties to a prior chapter 11 bankruptcy proceeding in which the plaintiff did not specifically disclose those causes of action. In reaching its decision the court conceded that it had never applied judicial estoppel in favor of a defendant who was not a party to the prior proceeding, but held that where the circumstances warrant the doctrine may be applied in favor of such a defendant. (81 F.3d at pp. 359-361.) The court also held that although some benefit to the plaintiff from its prior position may make application of the doctrine particularly appropriate, it is not a necessary precondition to the application of the doctrine. (*Id.* at p. 361.) Nevertheless, the court found the rule inapplicable because in that case the plaintiff neither affirmatively represented that it had no claims against the defendants nor misled the bankruptcy court about the existence and/or prosecution of the claims. (*Id.* at pp. 363-364.)

While plaintiffs attempt to bring themselves within the rationale of the *Ryan Operations* decision, we find the decision to be clearly inapposite for several reasons. First, in this case the defendant Bank was a creditor in the bankruptcy action and plaintiffs' listed their debt to the Bank as undisputed. Plaintiffs received the benefit of having their reorganization plan approved and the consequent deferral of the Bank's legal right to enforce its claims. And, in the present case the plaintiffs assert that the Bank's actions were the cause or catalyst of their bankruptcy petitions. These circumstances are in all important respects identical to the circumstances in *Oneida Motor Freight*, and in *Ryan Operations* the court did not question the application of judicial estoppel in the *Oneida Motor Freight* circumstances. (81 F.3d at p. 363.) In our decision we referred to the *Oneida Motor Freight* rule but explained that the majority of the numerous federal courts that have applied the rule rely on

principles of res judicata rather than judicial estoppel. Consistent with principles of res judicata those courts have applied the rule only in favor of subsequent defendants who were parties or in privity with parties to a prior bankruptcy. Since in *Ryan Operations* the subsequent defendants had been neither parties nor in privity with parties to the prior bankruptcy proceeding, the res judicata aspect of the rule was inapplicable and the court had no occasion to address the rule as we have set it forth and applied it. Finally, as we noted in our decision, plaintiffs' claim, reduced to its essentials, was a "core proceeding" within the bankruptcy action and, under federal law wholly independent of the *Oneida Motor Freight* rule, principles of res judicata preclude subsequent litigation of a core proceeding that was not pursued in the bankruptcy court.

For these reasons we find nothing in the *Ryan Operations* decision that casts doubt on the reasoning or conclusion of our decision in this case. Nothing else that plaintiffs have raised in their petition for rehearing requires comment. The petition for rehearing is denied.

Puglia, P. J., and Morrison, J., concurred.

A petition for a rehearing was denied May 7, 1996, and appellants' petition for review by the Supreme Court was denied August 5, 1996. Mosk, J., Baxter, J., and Chin, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.