Filed 5/19/15  Banayan v. Onewest Bank, F.S.B. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KAMRAN BANAYAN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ONEWEST BANK, F.S.B., et al.,<br><br>    Defendants and Respondents. | D064387<br><br><br><br>(Super. Ct. No. 37-2010-00105791) |

APPEAL from a judgment of the Superior Court of San Diego County, Steven Denton, Judge.  Reversed in part and affirmed in part.

Boudreau Williams and Jon R. Williams for Plaintiff and Appellant.

Shumener, Odson & Oh, Robert J. Odson and Edward O. Morales for Defendants and Respondents.

Kamran Banayan appeals a judgment after the trial court granted the motion for summary judgment filed by defendants OneWest Bank, F.S.B.; OneWest Ventures Holdings, LLC; IndyMac Mortgage Services; and IndyMac Venture, LLC (collectively OneWest).

In 2007, Banayan and OneWest's predecessor, IndyMac Bank, F.S.B. (IndyMac), entered into a construction to permanent loan agreement to finance the remodel of Banayan's home in La Jolla. Banayan alleges that during the loan's construction period the bank began a pattern of delayed and underfunded disbursements that continued as the bank failed and went into receivership with the Federal Deposit Insurance Corporation (FDIC) in the middle of 2008.

The FDIC completed the sale of IndyMac to OneWest in March 2009. Although Banayan failed to meet the loan agreement's original deadline the bank extended the time period for Banayan to complete construction. According to Banayan, disbursements continued to be delayed and ultimately he was required to complete the construction using his own resources. Then, once the construction was complete, OneWest refused to provide long term permanent financing and instead offered Banayan a three-year term loan. Banayan rejected the offer and OneWest initiated foreclosure proceedings. Banayan responded by filing the instant lawsuit. OneWest moved for summary judgment arguing, inter alia, it had made no misrepresentation to Banayan about the availability of long term financing and that it owed no duty of care to Banayan. The trial court granted the motion and entered judgment in favor of OneWest.

On appeal, Banayan argues there was sufficient evidence of misrepresentation and false promise by OneWest concerning the availability of long term financing to overcome summary judgment, and that during the construction phase of the loan agreement OneWest owed Banayan a basic duty of care. For the reasons set forth below, we reverse the summary judgment and remand for further proceedings.

2

FACTUAL AND PROCEDURAL BACKGROUND

Banayan has owned the home that is the subject of this case since 1994. In 2006 he applied for a loan from IndyMac to finance an extensive remodel of the property, which Banayan intended to use as his primary residence once the project was complete. While the application was being processed, Banayan began the demolition and remodel of the home. In January 2007 IndyMac agreed to loan Banayan up to $3,412,500. The loan was memorialized by a residential construction loan agreement, note, and deed of trust recorded against the property to secure Banayan's loan obligation.

The note represented "both a construction/home improvement loan and a permanent mortgage loan" and stated that if construction was completed prior to the "Permanent Loan Commencement Date, then the loan evidenced by [the] Note [would] automatically become a permanent mortgage loan on the Permanent Loan Commencement Date . . . ." The "Permanent Loan Commencement Date" was defined as "the first day of the month preceding the due date of the first monthly payment of principal and interest stated in the Note . . . if Completion (as defined in the Residential Construction Loan Agreement) has occurred before that date in accordance with the Residential Construction Loan Agreement." If "Completion" had not occurred by the "Permanent Loan Commencement Date" than Banayan would be in default.

Section 14 of the construction loan agreement, titled "Completion," stated: " 'Completion' shall be deemed to have occurred on the day the Property is ready for occupancy, subject only to the completion of the usual punch list items." Additionally, the provision required Banayan to provide the note holder with a notice of completion

3

and various certifications and documentation.  The agreement defined the "Completion Date" as January 3, 2009.

Under the construction loan agreement, Banayan acted as the general contractor for the remodel and made periodic requests for disbursements, also known as draw requests, to fund specific items of construction.  According to Banayan, for the first year of the construction period IndyMac made each of the first seven disbursements within one to six days of Banayan's draw request.[1]  Then, in 2008, Banayan experienced difficulty obtaining a disbursement.  In March, Banayan submitted a draw request of $90,000 to pay for a deposit for windows. Twenty-seven days after the request was submitted, IndyMac disbursed $2,228.  Shortly after, in July 2008, IndyMac failed and the FDIC was appointed as its receiver.  Banayan contends the bank made another substantially underfunded and delayed disbursement on July 16, 2008 and that he notified the bank in August that subcontractors had "demobilized from the project" because he could not pay them without fully funded disbursements.

The record is largely silent until January 14, 2009, when an entry on the bank's service log shows IndyMac's vice president, Kari Jackson, called Banayan to discuss an extension on the loan since the construction deadline had passed.  Banayan returned Jackson's call the next day and Jackson noted in the log that Banayan thought the project was six months from completion.  Jackson agreed to a two-month extension of the loan with no penalty.  Jackson also noted in the service log that Banayan asked about long

---

[1]    These disbursements, totaling $767,917.90, were all made to a limited liability company owned by Banayan called YBA Nineteen, LLC (YBA).

term financing, and that she advised him "that we can't do permanent loans with properties that are 66 percent complete. The home would need to be 95 percent complete and have a Certificate of Occupancy."[2]

On January 22, 2009, Jackson notified Banayan that the documentation for the extension could not be processed because the property was held by YBA and not in Banayan's individual name. The bank's service log indicates that by February 24, 2009, the property had been transferred back to Banayan and Jackson was working on the extension. An entry by Jackson on March 9, 2009, noted she had spoken with Banayan and was waiting on an inspection of the property and for an interest payment from Banayan before finalizing the extension.

On March 19, 2009, the FDIC completed the sale of IndyMac to OneWest. Banayan's contacts at the bank, Jackson and Marisa Broyles, remained the same. Jackson's next entry on the service log, dated March 23, 2009, states that "Borrower has brought the loan current," that an inspection had been ordered, and that Banayan was "looking for a draw." On March 31, 2009, a $60,000 draw was approved with the log noting: "Ok to disburse pending draw with matured completion date."

On April 21, 2009, OneWest received another draw request from Banayan. Jackson ordered an inspection and on April 24, 2009, Broyles e-mailed Banayan that the bank was unable to disburse funds to him because the project was 71.75 percent

---

2       This entry on the service log also notes that January 2009 "will be the first month that [Banayan] will need to a make a[n interest] payment." Interest payments before that point were deducted from a reserve account funded by the construction loan.

5

complete, but 79.89 percent of the loan had been disbursed. Broyles advised Banayan he needed to increase the percentage of completion to be eligible for additional disbursements. Banayan responded to Broyles that her completion calculations were off and provided specific examples of line items of construction for which disbursements were owed. In another e-mail to Broyles one month later, Banayan again complained the bank's percentage of completion was wrong and provided more examples of incorrect calculations for specific line items. Jackson wrote an e-mail to Banayan a few days later asking to "confirm that construction on the home will continue, the late mortgage payments will be made and the vesting will be changed back to an individual." Jackson indicated that she was aware Banayan was "working on the budget to ensure the costs for each line item [were] adequately allocated" but stated no further disbursements could be made until the home was over 80 percent complete.

E-mails from Broyles and Jackson in July 2009 show the bank would not approve further disbursements to Banayan because the project had not reached 80 percent completion and Banayan had not made monthly interest payments in April, May, June or July. On July 30, 2009, Jackson wrote to Banayan that the bank would disburse $80,000 once the outstanding interest payments were made. Banayan made an interest payment the following day and the bank disbursed $86,290 in August.

Prior to the August disbursement, on July 15, 2009, OneWest sent Banayan a letter informing him he was in default under the terms of the loan and that if he did not complete construction and pay $39,307.88 in interest by August 20, 2009, the bank would be entitled to the accelerated payment of all amounts due under the loan. The

6

letter stated that even if he cured the default and OneWest "elect[ed] to forbear from exercising its remedies under any existing or future defaults and continue[d] to disburse loan proceeds or otherwise allow[ed him] to complete construction . . . [Banayan would] be required to repay the Loan in full upon Completion of the Improvements on the Property."  The letter stated OneWest was "not obligated to, and does not intend to, provide [Banayan] long term financing when the Improvements are complete" and advised Banayan to "consider and investigate permanent financing alternatives."  In his declaration in opposition to OneWest's motion for summary judgment, Banayan acknowledged receiving the letter but stated Jackson told him "that so long as the interest payments were current and that progress was being made [on construction], there would not be any problems."

Despite Banayan's failure to make interest payments or complete construction, the bank did not take action against him.  Rather, through the fall of 2009 Banayan continued work on the project using his own funds to move it forward.  Banayan requested another disbursement in October 2009.  An e-mail from Jackson on November 6, 2009, advised Banayan that the bank had received an inspection report and he was eligible for a disbursement of $86,081 if he paid $20,000 in interest.  Jackson e-mailed Banayan on November 20, 2009, indicating the bank had received a "cost to complete" report validating that the remaining loan funds were sufficient to complete the project, but that there were no excess funds to cover outstanding interest payments.  The e-mail stated "as we previously agreed, if you pay half of the outstanding receivables we will agree to take

7

the other half from the loan on a one time basis." The e-mail noted that a mechanic's lien on the property needed to be cleared before funds were released.

On December 15, 2009, Banayan e-mailed Jackson a copy of the mechanic's lien release. Jackson responded that Banayan was eligible for an $88,000 draw based on the most recent inspection but that he owed $50,605 in interest and receivables. If Banayan agreed to pay $25,000 the bank would disburse $62,000. Banayan made the payment and the bank disbursed $62,395 ($88,000 less the remaining interest and receivables of $25,605) on December 23, 2009. Banayan claims after this disbursement, the bank began manipulating the completion percentages for various line items downward in order to delay or avoid additional disbursements. An inspection report dated January 7, 2010, showed the completion percentages declining from the prior inspection on July 16, 2009, on a number of line items.[3]

Banayan made additional draw requests in January and March 2010. After Banayan made an interest payment, OneWest disbursed $60,500 on February 23, 2010. On May 17, 2010, Banayan sent an e-mail to Jackson and Broyles stating the city had issued an occupancy permit and asking for additional funds to be disbursed. Banayan stated he would make interest payments once he had the bank's agreement it would release additional funds. In an e-mail dated May 24, 2010, Broyles told Banayan that

---

[3] The report reduced the percentage of completion on the pool from 90 percent to 80 percent, despite an additional outlay of $35,000 by Banayan to finish the perimeter and vanishing edge of the pool. The report also revised the percentage completion on "hardscape/driveway" from 90 percent to 80 percent and made downward revisions on several other line items.

8

although the permit was "signed off, [the] home is not complete and before [the bank] can provide you with a post construction modification the home needs to be completed." Banayan made another interest payment in June 2010. A June 9, 2010 entry on OneWest's service log indicated the loan was current and that the project was 95.82 percent complete. The bank disbursed $109,503 in June and an additional $20,349 in early July 2010.

On July 15, 2010, Broyles e-mailed Banayan stating "I'm looking to send out to you an extension for the construction period, additionally advising you of the Post Construction Modification terms available to you at the end your build." Banayan responded that he received his occupancy permit two months earlier and believed construction was complete under the terms of the loan agreement. On August 12, 2010, Jackson sent Banayan an e-mail stating that "[i]f the project is 99% or more complete, the interest is current and I'm in receipt of an updated insurance policy, we can disburse the remaining funds in the budget to you." The e-mail further advised Banayan that "the available modification for your loan is a 3 year balloon loan based on your current program." An inspection report dated August 17, 2010, assessed the project as 99 percent complete.

An entry by Jackson on the bank's service log dated September 1, 2010, stated Banayan told Jackson he was not interested in the proposed modification and that he would be hiring an attorney to pursue the 30-year financing he deserved. In response, Jackson advised Banayan that the bank's next step was to refer the loan to foreclosure. A "Notice of Default and Election To Sell Under Deed of Trust" was recorded on

9

September 29, 2010. After Banayan received the notice, he filed the instant action. Banayan's amended complaint, the operative pleading, asserted 19 causes of action: Breach of express contract; breach of written contract; breach of oral contract; breach of the implied covenant of good faith and fair dealing; promissory estoppel; promissory fraud; quiet title; reformation; rescission; fraud - intentional misrepresentation; fraud - concealment; negligence; breach of fiduciary duty; intentional interference with prospective economic damage; intentional infliction of emotional distress; wrongful foreclosure; violation of Business and Professions Code section 17200, et seq.; and for declaratory and injunctive relief.

OneWest demurred to the amended complaint. The parties agreed OneWest was not vicariously liable for the conduct of IndyMac based on the purchase agreement between OneWest and the FDIC. The trial court, however, found Banayan (with the exception of his third cause of action for breach of an oral agreement) had sufficiently alleged claims based on OneWest's own conduct after its acquisition of the bank. After the court's ruling on the demurrer, Banayan sought a preliminary injunction to prevent OneWest from proceeding with nonjudicial foreclosure of the property. After briefing and a hearing, the trial court denied the motion finding Banayan no longer owned the property and that the transfer of the property to YBA mooted the requested relief. Banayan did not appeal the order.[4]

_____

4    Shortly thereafter YBA filed for bankruptcy under chapter 11 of the United States Bankruptcy Code. OneWest asks this court to take judicial notice of some of the filings in that case that were not before the trial court. "As a general rule, documents not before

10

Thereafter, OneWest brought a motion for summary judgment or, in the alternative, summary adjudication. After full briefing and a hearing, the trial court granted the motion for summary judgment. Banayan challenges the trial court's ruling on just seven of his 19 claims: Promissory estoppel, promissory fraud, intentional misrepresentation, concealment, negligence, quiet title and violation of Business and Professions Code section 17200.

DISCUSSION

I

*APPLICABLE STANDARD*

A motion for summary judgment or adjudication shall be granted when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc.,[5] § 437c, subd. (c).) A defendant moving for summary judgment or adjudication has the "initial burden of production to make a prima facie showing of the nonexistence of any triable

---

the trial court cannot be included as part of the record on appeal and thus must be disregarded as beyond the scope of appellate review. [Citations.] Likewise disregarded are statements in briefs based on matter improperly included in the record on appeal." (*Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632.) Additionally, "[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) OneWest presents no reason to justify deviating from these general rules. Accordingly, its request for judicial notice of the bankruptcy filings is denied.

[5]    All further statutory references are to the Code of Civil Procedure unless otherwise noted.

issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  A defendant meets this burden either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense.  (*Ibid*.)  Once a defendant has demonstrated the plaintiff's evidence is deficient, the plaintiff may successfully oppose the motion for summary judgment by showing the evidence permits conflicting inferences as to the particular element of the cause of action or by presenting additional evidence of its existence.  (§ 437c, subds. (c), (p)(1); *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261.)

On appeal, we evaluate the respective evidentiary showings de novo to determine if the evidence permits conflicting inferences as to a particular element of the plaintiff's cause of action, or as to a defense to it.  In performing our review, "we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor."  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)  "We need not defer to the trial court and are not bound by the reasons for the summary judgment ruling; we review the ruling of the trial court, not its rationale."  (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 85.)

In this context, Banayan asserts he has adequately shown the existence of a misrepresentation and/or promise supporting his fraud and promissory estoppel claims. Banayan also contends the trial court incorrectly concluded OneWest owed no duty to Banayan that would support his claim of negligence.

## II

### *BANAYAN'S CLAIMS OF FRAUD (PROMISSORY FRAUD, INTENTIONAL MISREPRESENTATION, AND CONCEALMENT) AND PROMISSORY ESTOPPEL*

" 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) Promissory fraud is a subspecies of the claim of fraud and deceit. (*Ibid*.) "A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Ibid*.)

Under the doctrine of promissory estoppel, " '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise . . . .' [Citations.] Promissory estoppel is 'a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced.' " (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310.) The elements of a promissory estoppel claim are: "(1) a clear promise, (2) [reasonable and foreseeable] reliance, (3) substantial detriment, and (4) damages 'measured by the extent of the obligation assumed and not performed.' " (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 692.)

13

## A

OneWest contends the trial court's summary adjudication of Banayan's claims for fraud and promissory estoppel must stand because Banayan did not show the existence of either a promise or false representation that supports these claims.[6] Specifically, the bank contends that Banayan failed to set forth any evidence that the bank's representatives promised the availability of long term financing once the deadline for the completion of the project had past. OneWest asserts Banayan's "own evidence demonstrates that IndyMac Federal informed [Banayan] that he was *not* eligible to obtain permanent financing because he failed to complete construction." (Original italics.)

We disagree with the trial court's conclusion that "the only reasonable inference that can be derived from the totality of th[e] evidence is that no false statements were made." When Banayan's evidentiary submissions are liberally construed in his favor, they raise triable questions of material fact as to whether Banayan was fraudulently misled by OneWest and whether OneWest made a promise of permanent financing that induced Banayan's reasonable and foreseeable reliance. Specifically, as described in more detail below, Banayan points to three pieces of evidence that support these claims:

---

6     OneWest also argues Banayan has improperly raised a new factual argument on appeal by contending that he was promised a 30-year mortgage, and not just a modification of some type. OneWest asserts that in opposition to its motion for summary judgment, Banayan contended only that defendants "misrepresented that he would receive *an unspecified* modification upon completing construction" and not specifically a 30-year mortgage. (Original italics.) OneWest's argument lacks merit. Banayan's brief in opposition to summary judgment asserted that OneWest promised Banayan not just a modification, but a modification providing "permanent long-term financing." The trial court itself recognized a 30-year mortgage as the false promise Banayan was asserting.

14

(1) Banayan's testimony that Jackson, on behalf of OneWest, made "successive promises" that OneWest would provide a 30-year mortgage; (2) Banayan's testimony that after he received the July 15, 2009 letter of default from OneWest Jackson advised him "there would not be any problems"; and (3) Jackson's deposition testimony that Banayan "would be eligible for permanent financing if he had a certificate of occupancy and the project was 95% complete."

At his deposition, Banayan was asked to explain his earlier testimony of " [']why should I get a final [certificate of occupancy] on a property that I have worked for for six years so that a lender could foreclose it?['] "  Banayan responded "I have worked very hard for six years.  I have spent substantial amounts of assets and money, pain and suffering into this property, and against all odds, while the lender would make my life difficult by not disbursing funds.  [¶] I was still able to finish the house.  And why don't I finish[] it *after the successive promises that your financing will be intact; that you will -- I will have what they promised me, which was a 30-year mortgage, right when I finished it*, they reduced it to a 3-year mortgage, and I had to file this action."  (Italics added.) When construed in favor of Banayan, a reasonable inference drawn from this testimony is that OneWest promised Banayan that a 30-year mortgage would be available once construction was complete.

Banayan's declaration in opposition to the motion for summary judgment also shows the existence of a promise by OneWest to provide long term financing after it sent Banayan the letter of default on July 15, 2009.  Banayan stated:  "On or around July 15, 2009, I received a Letter of Default from OneWest [citation].  Immediately, and on

15

several occasions thereafter, I spoke with Jackson who contradicted OneWest's position in its letter. Her response to me over the phone was that it was only a letter of default, and not a notice of default which would be recorded against the property. She advised me, orally and in writing, that so long as the interest payments were current and that progress was being made, there would not be any problems." The declaration statement does not explicitly state Jackson promised Banayan a 30-year mortgage. A reasonable interpretation, however, of Jackson's statement that "there would not be any problems" is that long term financing would be available at the end of construction. This interpretation is particularly reasonable in light of the undisputed fact that the original agreement provided for a 30-year adjustable mortgage. These statements by Banayan are sufficient to create a triable issue of fact. (See *Estate of Housley* (1997) 56 Cal.App.4th 342, 359-360 ["the sole declaration of a party opposing a summary judgment motion which raises a triable issue of fact is sufficient to deny that motion. . . . Further, . . . Code of Civil Procedure section 437c, subdivision (e) does not allow a trial court to weigh the credibility of a declaration submitted by the party opposing a summary judgment motion and then grant the motion, except where the declaration is facially so incredible as a matter of law that the moving party otherwise would be entitled to summary judgment."].)

Finally, Banayan points to Jackson's deposition testimony that Banayan "would be eligible for permanent financing if he had a certificate of occupancy and the project was 95 percent complete." The full question posed to Jackson was "[n]ow, earlier you had told Mr. Banayan that he would be eligible for permanent financing if he had a certificate

16

of occupancy and the project was 95 percent complete. Do you remember that email that we went over?" To which Jackson responded, "Yes." OneWest contends this is not evidence of a promise of long term financing by Jackson because Banayan's counsel referred to this as a statement Jackson made in an e-mail to Banayan and the e-mail itself is not identified in the record. Regardless of the reference to an unidentified e-mail, this statement by Jackson is reasonably interpreted as an acknowledgement that she had promised Banayan the long term financing he was seeking. (See *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 ["we liberally construe plaintiffs' evidentiary submissions and strictly scrutinize defendants' own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor."].)[7]

OneWest argues that Banayan's evidence of a misrepresentation is insufficient to overcome summary judgment because he has not identified "the name of the persons that made [the successive promises he referred to in his deposition], exactly what was said, when it was said and by what means." OneWest contends, unlike the borrower in *Jolley*

---

[7] Other evidence Banayan relies on does not clearly support his contention of a promise to provide long term financing. He points to a notation in the bank's internal service log "showing the loan as 'current' and extended as late as June 9, 2010." This entry does not show a misrepresentation by the bank because there is no evidence this information was either communicated to Banayan or that a notation that the loan was "current" meant that the bank would ultimately provide financing. Likewise, e-mails to Banayan from OneWest dated May 24, 2010, stating Banayan "must complete the home to receive the 'post construction modification,' " and dated July 15, 2010, stating "I'm looking to send out to you an extension for the construction period, additionally advising you of the Post Construction Modification terms available to you at the end of your build," do not contain a promise of long term financing. Neither this evidence or OneWest's evidentiary submissions, however, establish the absence of an actionable promise and this question of fact should reach the trier of fact.

17

*v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872 (*Jolley*), who "clearly set forth evidence of unambiguous representations made by specific individuals after [the defendant bank's] acquisition of the loan from the FDIC," Banayan offers no evidence of a representation by OneWest that permanent financing would be available once construction was complete. OneWest both overstates Banayan's evidentiary burden and understates Banayan's evidence. As described above, a reasonable inference drawn from the evidence described herein is that Banayan was promised long term financing by OneWest even after he was sent the notice of default. This evidence was sufficient to overcome summary judgment of Banayan's fraud and promissory estoppel claims.[8]

Banayan relies on *Jolley* in his briefing and we agree that *Jolley* is instructive here. Like Banayan, Jolley obtained a construction loan for a residential property. (*Jolley*, *supra*, 213 Cal.App.4th at p. 878.) Jolley experienced problems obtaining timely disbursements from the bank, Washington Mutual (WaMu), but proceeded with construction using his own funds. (*Ibid*.) During the loan's construction period, WaMu failed and was taken over by the FDIC who sold the bank's assets, including Jolley's loan, to JP Morgan Chase (Chase). (*Id*. at p. 879.) After the bank was taken over by Chase, Jolley continued to deal with the same bank employees. (*Id*. at p. 880.) Like Banayan's

---

[8]    In addition to finding the evidence did not sufficiently establish the existence of an actionable promise, the trial court also rejected Banayan's promissory estoppel claim on the ground that, unlike *Jolley, supra*, 213 Cal.App.4th 872, the "undisputed evidence demonstrates defendants were ready and willing to fund the entire loan, and would have but for plaintiff's breaches." Banayan's promissory estoppel claim, however, is based on OneWest's reassurances that there were no problems and the financing set forth in the original agreement would be available once the construction was complete despite the fact that the construction deadline had past.

18

loan agreement, Jolley's loan contained a provision to roll the construction loan into a conventional mortgage once construction was completed. (*Ibid*.) Also like Banayan, Jolley testified that he was led to believe Chase would honor this provision despite delays in the construction of the home. (*Ibid*.)

Shortly after Chase took over WaMu, Jolley made a final payment on the loan "claiming he was forced to default thereafter by WaMu's breaches and negligence in the funding of the construction loan." (*Jolley*, supra, 213 Cal.App.4th at p. 880.) Jolley then tried to secure a loan modification to obtain additional financing to complete construction, telling Chase " 'in great detail' about the prior problems with the loan." (*Ibid*.) Jolley testified "he was encouraged on many occasions by North [Chase's employee] that, in light of the history of the problems with WaMu, there was a 'high probability' that Chase 'would be able to modify the loan so as to avoid foreclosure.' " (*Id*. at p. 881.) According to Jolley, North said " 'the likelihood was good,' that it was 'likely' when construction was complete he could roll the construction loan into a fully amortized conventional loan." (*Id*. at p. 881.) Chase, however, ultimately demanded payment in full and instituted foreclosure proceedings on the property. (*Ibid*.)

Just before the scheduled foreclosure, Jolley brought suit against Chase, who successfully obtained summary judgment of the complaint based largely on provisions of Chase's purchase and assumption (P&A) agreement with the FDIC under which the trial court found Jolley's claims for intentional and negligent misrepresentation by WaMu were barred because Chase had expressly not assumed liability for such claims in the P&A agreement. (*Jolley, supra,* 213 Cal.App.4th at p. 884.) The trial court also found

Jolley's claim for promissory estoppel failed because North's alleged statements after Chase took over the loan concerning the likelihood of a conventional mortgage did not constitute "a clear and unambiguous promise . . . ." (*Ibid*.)

The Court of Appeal reversed the judgment, reinstating Jolley's claims for intentional and negligent misrepresentation and promissory estoppel against Chase. The court held Jolley had alleged misrepresentations by North *after the loan was assumed by Chase* and rejected the trial court's conclusion that North's statements were nonactionable opinions on which Jolley could not have reasonably relied. (*Jolley, supra,* 213 Cal.App.4th at pp. 892-893.) The court noted it "is well settled that an opinion may be actionable when it is made by a party who 'posses[es] superior knowledge' " and that it is "[e]qually well recognized . . . that there may be liability for an opinion where it is 'expressed in a manner implying a factual basis which does not exist.' " (*Id*. at pp. 892-893.) The court found Jolley's evidence was sufficient to overcome summary judgment: " '[W]here there is a reasonable doubt as to whether a particular statement is an expression of opinion or the affirmation of a fact, the determination rests with the trier of the facts.' " (*Id*. at p. 893.)

The *Jolley* court distinguished another case, *Conrad v. Bank of America* (1996) 45 Cal.App.4th 133 (*Conrad*), in which a promissory fraud claim was overturned on the defendant's motion for judgment notwithstanding the verdict because the plaintiff failed to establish the existence of a fraudulent promise. (*Jolley*, *supra*, 213 Cal.App.4th at pp. 894-895.) In *Conrad*, the plaintiff claimed the bank defendant falsely promised to make a loan. The evidence at trial of the false promise consisted of: (1) the bank's loan

officer statement of "no problem" to the plaintiff in response to the plaintiff's statement to the loan officer that it "might need some loans" and (2) the loan officer's agreement to process the plaintiff's loan application, which the plaintiff testified that he "understood to mean [the bank] would make the loan." (*Conrad, supra,* at p. 156.) The court held this evidence was insufficient to "support the claim that [the bank's loan officer] promised to approve a loan . . . knowing that the loan would not be made." (*Id*. at p. 157.) Rather, the evidence "establishe[d] nothing more than a willingness to consider future loan applications and [did] not establish a fraudulent promise to make a loan." (*Id*. at p. 156.)

Construing the evidence favorably to Banayan, as we must, we conclude the evidence here is closer to *Jolley, supra,* 213 Cal.App.4th 872 than *Conrad, supra,* 45 Cal.App.4th 133. Like the plaintiff in *Jolley*, Banayan identified the representatives he dealt with at OneWest (Jackson and Broyles) and his testimony was that after the completion deadline had past, over the course of construction, these bank representatives promised long term financing would be available once the project was complete. Unlike *Conrad*, where there was no prior explicit promise of future financing to the plaintiff, in this case Banayan's initial loan agreement included a 30-year mortgage at the end of construction. Banayan's testimony in his declaration and during his deposition was that despite delays in construction he was told that financing would still be available. Further, Jackson herself testified she recalled making such a promise. As stated, the question of whether such a promise was made is for the trier of fact.

B

Banayan also presented sufficient evidence to create a triable issue of fact concerning whether the bank fraudulently induced Banayan to complete the home without intending to provide long term financing. OneWest contends it "clearly communicated that it was not going to provide 'permanent financing,' " and that Banayan "does not demonstrate that he was encouraged to continue construction based upon a promise of permanent financing." However, the evidence discussed above and additional deposition testimony by Jackson demonstrates otherwise. Specifically, Jackson stated she "wanted to give [Banayan] an incentive to complete the project so the bank wouldn't be stuck with a half-finished house."

Further, the bank's January 7, 2010 inspection report, which documented the project's progress, showed several line items with decreasing percentages of completion as the project neared its end. The trial court's order granting summary judgment recognized this could reasonably be viewed as " 'evidence that OneWest pressured inspectors to reduce completion percentages,' " which "would be conduct from which fraud could be implied." But the trial court then rejected this inference. The court cited the declaration of the inspection company's representative who denied the company was asked to modify the reports and concluded "there is no explanation for this reduction and it is speculation to assume this resulted from 'pressure.' " By reaching this conclusion, however, the trial court itself weighed the evidence to conclude there was no undue pressure from the bank.

OneWest asserts its evidence conclusively demonstrates the lowering of the completion percentages in the inspection reports was not the result of fraud. It argues Banayan asks this court to speculate and "assume, without evidence, that [OneWest] exerted some sort of 'pressure' to reduce the inspection results." The evidence OneWest relies on consists of the declaration of the inspection company's president, who stated he was not pressured to lower the percentages of completion and the declaration of Jeanie Caldwell, a OneWest vice-president who was "one of [OneWest's] agents responsible for servicing of the loan at issue," stating that neither she "nor any other employee of the defendants in this action . . . ever requested [the inspection companies] to modify their reports . . . ."

OneWest, however, provides no explanation as to why the percentages of completion declined in the face of Banayan's continued work on the project. Caldwell provides no foundation for her assertion that no other OneWest employee manipulated the inspection report. Likewise, the president of the inspection company, Brad Meyer, states only that "to the best of [his] knowledge, [no] defendant in this action [has] ever requested Trinity to modify the Reports for this property to reduce the percentage of completion . . . ." Meyer asserted no personal knowledge concerning his company's work on the property. His declaration describes what the company's procedures are for inspection properties *like* Banayan's, but not what the company did with respect to Banayan's property. OneWest simply offers its own speculation as to the reason for the reductions, stating "results could have changed for a variety of reasons including

23

[Banayan's] decision to modify the construction work or budget" or "construction 'changes requested by the City of San Diego.' "

As even the trial court noted, if the bank reduced percentages of completion this alone would support a reasonable inference of scienter and fraudulent intent. Further, Jackson explicitly stated the bank wanted Banayan to continue to complete the project to improve the value of its collateral. Banayan's evidence created conflicting inferences as to the elements of scienter and fraudulent intent. As in *Jolley*, "while there may not be any direct showing of an intention to defraud," it is clear that OneWest would benefit from Banayan's "further investment in the construction project. This is so because the bank could ultimately foreclose on a newly renovated property instead of a stalled construction project, making its ability to realize on the asset more fruitful." (*Jolley, supra,* 213 Cal.App.4th at p. 895.) OneWest's prolonging of the construction period allowed its "investment in the property to mount" while Banayan's "equity, if any, was consumed in a declining real estate market." (*Ibid.*) In sum, a reasonable inference drawn from the evidence when it is construed in Banayan's favor is that OneWest's intent was fraudulent.

C

We also conclude that Banayan presented sufficient evidence of reliance and damages to overcome OneWest's motion for summary judgment with respect to his fraud and promissory estoppel claims. Banayan presented evidence that he spent personal funds to pay his subcontractors and invested substantial time as the project's general contractor in reliance on OneWest's representation that long term financing would be

24

available once the project was done.[9]  Such action by Banayan was "entirely foreseeable in light of the history of the construction loan, the unfinished status of the underlying project, and" the alleged statements by Jackson that Banayan would receive a long term mortgage "once construction was completed."  (*Jolley, supra,* 213 Cal.App.4th at p. 893.)

OneWest asserts Banayan cannot show reliance or damages on his claims for fraud and promissory estoppel because Banayan was "already contractually obligated to (i) pay monthly interest, (ii) repay the loan, (iii) complete construction on the Property and (iv) pay for all construction costs or, otherwise, be deemed in default."  While the interest payments Banayan made may be excluded from damages if they are ultimately determined owed to the bank under Banayan's loan agreement, other expenses Banayan claims were incurred in reliance on the bank's promise are outside the contractual obligations cited by OneWest.  The personal funds and time Banayan invested into the home after the bank determined Banayan was in default and not ever eligible for long term financing are recoverable damages if the trier of fact determines OneWest falsely promised the availability of long term financing after this determination was made.  (See *Jolley, supra,* 213 Cal.App.4th at p. 893 ["Whether [plaintiff's] reliance was justified in the circumstances is a factual question for a jury, not one for summary judgment."].)  Likewise, these damages may be recoverable if the trier of fact concludes OneWest

---

9       OneWest asserts Banayan's evidence, consisting of e-mails to Jackson and Broyles showing his expenditures on the project he claimed were made necessary by delayed disbursements, is inadmissible hearsay.  The trial court, however, overruled OneWest's objections to this evidence and OneWest has not appealed those rulings.  These e-mails raise a triable issue of fact concerning Banayan's damages.

25

should be held liable for its promise, even if the bank lacked the requisite scienter to establish fraud.

D

As noted, the parties agree OneWest is not liable for any conduct by IndyMac prior to the assignment of the loan to OneWest by the FDIC. For this reason, the federal rules advanced by OneWest requiring administrative review for claims arising prior to or during an FDIC receivership are inapplicable. Although *Jolley* reversed claims based on the conduct of the bank that originated the loan in addition to the conduct of the successor bank, this does not make *Jolley* inapplicable. OneWest correctly points out that *Jolley* held material issues of fact existed concerning whether the P&A agreement between the FDIC and Chase precluded the borrower's claims based on the bank's conduct prior to that agreement. (*Jolley*, *supra,* 213 Cal.App.4th at p. 892.)

*Jolley*, however, also overturned summary judgment of Jolley's claims with respect to Chase's own conduct after the FDIC receivership ended. (*Jolley*, *supra,* 213 Cal.App.4th at pp. 892, 895.) Because of this, OneWest's assertion that the outcome of *Jolley* "clearly would have been different had the purchase agreement between Chase and the FDIC been properly admitted into evidence and not subject to dispute" is incorrect. Like *Jolley*, when the evidence here is viewed, as it must be, in the light most favorable to Banayan, Banayan has shown the existence of a triable issue of material fact as to whether he was promised long term financing by OneWest. This open factual question precludes summary judgment of Banayan's claims for both fraudulent misrepresentation and promissory estoppel.

26

III

*NEGLIGENCE*

"To state a cause of action for negligence, a plaintiff must allege (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's damages or injuries.  [Citation.]  Whether a duty of care exists is a question of law to be determined on a case-by-case basis."  (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 62 (*Lueras*).)  Typically borrowers and lenders operate at arm's length and "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money."  (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096.)

In its motion for summary judgment, OneWest successfully argued it owed no duty to Banayan.  The trial court concluded Banayan's "relationship with the bank was that of a normal lender-borrower" and that there was "no evidence that a special relationship existed" to create a duty of care.  As he did in the trial court Banayan argues that, as a construction lender and under the circumstances in this case, OneWest owed him a duty of care in the administration of the loan and that it breached that duty in its handling of loan disbursements and with respect to its alleged promise of a long term mortgage at the completion of construction.

Banayan relies on *Jolley* to contend that OneWest was not a mere lender of money that owed him no duty of care.  In *Jolley*, the court recognized that a duty of care does not

27

usually apply in the context of a borrower and lender, but noted the determination is "not subject to a black-and-white analysis—and not easily decided on the 'general rule.' " (*Jolley, supra,* 213 Cal.App.4th at p. 898.)  The *Jolley* court identified the negligent conduct at issue as Chase's failure to investigate the history of the loan in determining whether to make additional disbursements once it had taken over and Chase's failure to review Jolley's loan modification request in good faith, instead deciding in advance to extend no further financing.  (*Id*. at p. 899.)

The *Jolley* court examined six factors, indentified in *Biakanja v. Irving* (1958) 49 Cal.2d 647, to determine whether the imposition of a duty of care on Chase was appropriate:  "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm."  (*Jolley*, *supra,* 213 Cal.App.4th at p. 899.)  The court concluded that under the *Biakanja* factors, Chase's conduct showed "triable issues of fact exist as to the relevant considerations underlying duty in this case," and that Chase had not established it was entitled to summary judgment.  (*Jolley, supra,* 213 Cal.App.4th at p. 906.)

Banayan asserts OneWest's conduct is similar to Chase's conduct in *Jolley*.  We agree and conclude summary judgment was not properly granted as to Banayan's negligence claim.  Like Jolley, with respect to the first *Biakanja* factor, Banayan "was the person in direct negotiation, and contractual privity, with the loan originator [IndyMac],

from which [OneWest] took over" and Jackson's alleged representations concerning long term financing "were made directly to" Banayan, "and were certainly likely to, if not intended to, affect his decisionmaking." (*Jolley, supra,* 213 Cal.App.4th at p. 900.) The second, third and fourth *Biakanja* factors also weigh in favor of finding OneWest owed a duty of care to Banayan. The harm Banayan suffered (consisting of Banayan's additional expenses to push the project to completion) as a result of Jackson's representations that permanent financing would be available and OneWest's untimely disbursements was a foreseeable injury directly related to OneWest's conduct. The moral blame attached to OneWest's conduct remains in question. But, as discussed with respect to the evidence of OneWest's scienter for purposes of Banayan's fraud claim, the alleged manipulation of the completion percentages and Jackson's testimony that she wanted to encourage Banayan to complete the construction so that the asset was more valuable "lends itself to a blameworthy interpretation." (*Jolley, supra,* at pp. 900-901.)

To support its position that it owed no duty to Banayan OneWest cites *Lueras, supra,* 221 Cal.App.4th 49 in which the court declined to extend a duty of care to a mortgage lender's dealings with a residential borrower who had tried to obtain a loan modification because of personal financial hardship. The *Lueras* court distinguished *Jolley, supra,* 213 Cal.App.4th 872, noting *Jolley* "acknowledged it was dealing with a construction loan, not a residential home loan 'where, save for possible loan servicing issues, the relationship ends when the loan is funded.' " (*Lueras, supra,* at p. 66.)

The *Lueras* court held the *Biakanja* factors did not support the application of a duty of care between lender and borrower of a conventional mortgage. The *Lueras* court

29

stated "[i]f the lender did not place the borrower in a position creating a need for a loan modification, then no moral blame would be attached to the lender's conduct." (*Lueras, supra,* 221 Cal.App.4th at p. 67.) "Lueras did not allege [the lender] did anything wrongful that made him unable to make the original monthly loan payments" or that "exacerbated his initial default by negligently servicing the loan. To the contrary, he alleged his inability to make the payments was caused by" his family's personal financial hardship. (*Id.* at p. 68.) Here, unlike the bank in *Lueras*, Banayan presented evidence supporting a finding that OneWest's failure to make timely disbursements and OneWest's representations concerning the availability of long term financing were the cause of his injury.[10] We conclude the trial court's determination that OneWest owed no duty to Banayan was error. As in *Jolley*, we hold " 'that triable issues of fact exist as to the relevant considerations underlying duty in this case, and that [OneWest] failed to

_____

[10]    OneWest cites two additional cases for the proposition that construction lenders owe no duty to borrowers: *Kinner v. World Sav. & Loan Assn.* (1976) 57 Cal.App.3d 724 and *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974. In those cases, however, the loans were more akin to the relationship in the conventional mortgage setting and there was no ongoing relationship between the borrower and lender. In *Kinner*, the bank defendant made a loan to the plaintiff in a single lump sum to build an apartment complex. (*Kinner, supra,* at p. 727.) The plaintiff alleged the sum was insufficient for the project and the bank was, therefore, negligent in not loaning more. (*Id.* at p. 728.) Both the allegedly negligent conduct and the relationship between lender and borrower in *Kinner* are distinguishable from the ongoing relationship between OneWest and Banayan here. In *Kim*, the lender's relationship with the borrower was also limited. Instead of the lender determining when disbursements would be made, a third party agency was given the contractual authority by the plaintiffs to determine when disbursements were made. (*Kim, supra,* at p. 977.) Therefore, the court concluded there was no duty of care owed by the bank to the lender in the disbursement of funds. (*Id.* at p. 981.) Here, it is not disputed that OneWest controlled the disbursements of funds to Banayan.

establish that it was entitled to judgment as a matter of law.' " (*Jolley, supra,* 213 Cal.App.4th at p. 906.)

V

*BANAYAN'S CLAIMS FOR VIOLATION OF THE UNFAIR COMPETITION LAW, WRONGFUL FORECLOSURE, AND QUIET TITLE*

Banayan's claims for violation of Business and Professions Code section 17200, et seq. and wrongful foreclosure are predicated on his fraud claims. Because we conclude the fraud claims were improperly dismissed on summary judgment, we also reinstate these two concomitant claims.

With respect to Banayan's claim to quiet title, OneWest contends this claim was properly dismissed regardless of the outcome of Banayan's fraud claims because the claim requires the ownership or possession of the property. In support of its contention that the property is not owned by Banayan, OneWest cites an undisputed statement of fact it submitted in support of its motion for summary judgment below that "YBA is the owner of the Property pursuant to" a quit claim deed transferring the property to YBA on April 27, 2009 and Banayan's deposition testimony that the property is owned by YBA. Banayan concedes an action to quiet title requires the plaintiff to show "he is the owner and in possession." Further, Banayan did not dispute the fact that YBA owned the property asserted by OneWest in the trial court. Banayan's claim to quiet title was, therefore, properly dismissed.

31

DISPOSITION

The judgment is reversed with respect to Banayan's claims for promissory fraud, negligent misrepresentation, concealment, promissory estoppel, negligence, wrongful foreclosure and violation of Business and Professions Code section 17200 and affirmed with respect to Banayan's claim to quiet title. The matter is remanded for further proceedings consistent with this opinion. The parties are to bear their own costs on appeal.

HUFFMAN, Acting P. J.

I CONCUR:


HALLER, J.

32

O'ROURKE, J., Dissenting

I respectfully dissent. The trial court correctly granted summary judgment in favor of defendants OneWest Bank, FSB, OneWest Ventures Holdings, LLC, IndyMac Mortgage Services, and IndyMac Venture, LLC. Plaintiff does not challenge the entry of summary judgment on his contract claims. In my view, this is a matter in which plaintiff, who entered into a construction loan agreement with IndyMac Bank, FSB (IndyMac) and thereafter defaulted on the loan's terms, has simply recast his contract claims into tort claims. Defendants' complained of conduct at best amounts to asserted breaches of the loan agreement's obligations to disburse monies and grant permanent financing upon timely completion. "A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations." (*Aas v. Superior Court* (2000) 24 Cal.4th 627, 643, superseded by statute on another ground as stated in *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1079-1080; see *State Ready Mix, Inc. v. Moffatt & Nichol* (2015) 232 Cal.App.4th 1227, 1232.) Instead, " ' "[c]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." ' " (*Aas v. Superior Court*, at p. 643.)

The construction loan agreement defines and circumscribes the parties' obligations. As plaintiff acknowledged in his summary judgment opposition, the agreement sets out procedures for construction advances, as well as a draw schedule. The agreement provides that "Lender shall have no obligation to make any advance if, at the

time the request for such advance is made, Borrower is in default with respect to any provision of this Agreement or of any instrument referred to herein."  It provides further that "[e]ach advance is subject to the satisfaction, as determined solely by Lender, of the following conditions at the time of such advance" including that "[t]he Borrower has fully complied with all obligations under this Agreement and is entitled to such advance, it being understood that the making of any advance when the undersigned is not entitled to it will not constitute a waiver by the Lender of such compliance in that or any other case."  Under the agreement, "[t]ime is of the essence as to the completion of Improvements."  The agreement specifies that the lender's failure "to exercise or enforce any right, power or remedy under this Agreement shall not constitute a waiver of such right, power or remedy."  It states:  "This Agreement may be amended only by contemporaneous or subsequent written agreement executed by the parties to be bound thereby."  An addendum to the adjustable rate note executed by plaintiff in January 2007 provides:  "The written Loan Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties."

In his opposing summary judgment declaration, plaintiff recounts instances in which IndyMac either underfunded or made untimely disbursements, failed to make disbursements, or delayed disbursements despite proper draw requests.  He states that after OneWest succeeded to IndyMac, it withheld disbursements and monies owed to him.  Plaintiff avers, "Even though I complied with my obligations under the loan

2

agreement, IndyMac failed to make timely disbursements." Plaintiff further states that OneWest "failed to utilize the actual percentages of completion determined by the inspectors when deciding what amounts would be disbursed." As to permanent financing, he avers: "At the point in time when I was going to acquire a final permit, OneWest failed to offer to me a 30-year mortgage that was expressly provided for in the Loan Agreement." Plaintiff's assertion of claims sounding in fraud, promissory estoppel, and negligence based on the delays in disbursements, failures to act, or One West's decision not to offer permanent financing "is an improper attempt to recast a breach of contract cause of action as a tort claim." (*BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 853.) Under the circumstances, I perceive no "social policy that would demand resort to tort remedies." (*Ibid.*)

Even if plaintiff's claims were not precluded on that ground, I would hold that under the most favorable view of his evidence, he has not established triable issues of material fact with respect to his fraud-based claims[1] and the attendant claims for

---

1       To establish fraud, plaintiff must show there was a false representation, concealment, or nondisclosure; intent by defendants to make false statements; intent to induce reliance; justifiable reliance; and damages. (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1185-1186.) A fraud claim based on suppression or concealment of a material fact must involve a defendant who has a legal duty to disclose that fact. (Civ. Code, § 1710, subd. (3); *Hoffman*, at p. 1186.) Whether a person's reliance is justifiable may be decided as a matter of law if reasonable minds can reach only one conclusion based on the facts, and in that case, summary judgment or adjudication is appropriate. (*Hoffman*, at p. 1194.)

3

wrongful foreclosure and unfair or unlawful business practices, or his claims for promissory estoppel and negligence.  On a summary judgment motion, this court must " 'determine what any evidence or inference *could show or imply to a reasonable trier of fact. . . .*  In so doing, [we do] not decide on any finding of [our] own, but simply decide[ ] what finding such a trier of fact could make for itself.' "  (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 885, quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856.)  But inferences must be *reasonable* to raise triable issues of material fact on summary judgment.  (Evid. Code, § 600, subd. (b) ["An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action"]; *Carlsen*, at p. 891; *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1529-1530.)  And, "a party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact.' "  (*Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 945-946.)

Here, the evidence is undisputed that as of July 15, 2009, OneWest informed plaintiff in no uncertain terms he was in default, that even if he cured the default and it elected to forebear he would still be required to repay the loan in full upon the project's completion, it would not provide him long-term permanent financing when construction was complete, and that he should pursue permanent financing alternatives.  It required him to complete construction by August 20, 2009, or be subject to an accelerated payment of all loan amounts due.  After OneWest sent this letter, plaintiff asserts in his summary judgment declaration that he relied on Kari Jackson's various assurances to him

4

"that it was only a letter of default, and not a notice of default which would be recorded against the property" and that "so long as the interest payments were current and that progress was being made, there would not be any problems."  A reasonable fact finder simply cannot infer from that vague statement (or others like it), from OneWest's subsequent loan disbursements,[2] or from OneWest's inaction, any promise to extend permanent financing, much less a promise that is "clear and unambiguous in its terms" (*Jones v. Wachovia Bank*, *supra*, 230 Cal.App.4th at p. 945 [claim for promissory estoppel requires clear and unambiguous promise]) on which plaintiff could be expected to justifiably rely to his detriment.  (*Ibid.*; *Hoffman v. 162 North Wolfe LLC*, *supra*, 228 Cal.App.4th at pp. 1195-1197 [landlord's representation that " 'we'll take care of it' " in response to plaintiff's complaint about vehicles traveling onto property was insufficient to support element of reasonable reliance as a matter of law where plaintiff, among other things, continued to observe trespassing vehicles over property and he was an experienced real estate agent].)  To the extent any inference may be drawn from Jackson's "there would not be any problems" assurance, it is that Jackson was informing plaintiff of OneWest's intentions not to proceed with foreclosure.  Nothing in Jackson's statement suggests that in the face of plaintiff's repeated defaults, OneWest would retract its July 15, 2009 decision and provide him permanent financing upon the project's completion.

---

[2]    Evidence that OneWest continued to disburse funds after notifying plaintiff of his defaults cannot be reasonably inferred as an assurance to plaintiff he would obtain the financing of the original loan agreement.  The loan agreement expressly permitted OneWest to disburse funds even when plaintiff was not entitled to the disbursement without waiving its rights under the agreement.

Because this is the sole representation of OneWest on which plaintiff relies following OneWest's July 15, 2009 default letter, summary judgment was properly granted in defendants' favor on plaintiff's fraud-based claims.[3]

Plaintiff argumentatively asserts in his opposing summary judgment declaration that a January 4, 2010 inspection report suggests OneWest "pressured inspectors to reduce completion percentages" in determining what amounts would be disbursed. From this, the majority circumstantially infers scienter and fraudulent intent, faulting the trial

---

[3]     To the extent plaintiff seeks to rely on Jackson's earlier January 15, 2009 statement concerning the terms of permanent financing, such a statement is not reasonably construed as a promise that OneWest *would in fact extend* permanent financing to him. And plaintiff's representation that Jackson "admitted that she promised [plaintiff] permanent financing if he completed 95 [percent] of the project and received an occupancy permit" is unsupported by the record. Plaintiff cites Jackson's deposition testimony, in which only *counsel's compound question* forms the basis for the asserted promise:

"Q. Now, earlier you had told Mr. Banayan that he would be eligible for permanent financing if he had a certificate of occupancy and the project was 95 percent complete. [¶] *Do you remember that e-mail that we went over*?
"[Jackson:]  Yes.
[¶] . . . [¶]
"Q. Did you give Mr. Banayan permanent financing at this point in May 2010?
[¶] . . . [¶]
[Jackson:] No." (Italics added.) Because the record contains no evidence as to *when* any such e-mail was sent, there is no way to tell whether the asserted representation was made *before or after* IndyMac's sale to OneWest, and can be considered even potentially actionable conduct by OneWest. Even assuming Jackson admitted making the statement characterized by counsel's question, and the statement was made after the sale to OneWest, it was a statement concerning plaintiff's *eligibility*, not a statement from which a trier of fact can reasonably infer a promise to extend permanent financing. Finally, plaintiff points to deposition statements by a OneWest vice president, who merely testified that 95 percent completion was "the benchmark for completion" and that this and a certificate of occupancy were necessary to show a property was ready for occupancy. Nothing in these statements shows any promise made to plaintiff concerning permanent financing.

court for rejecting such an inference and discounting OneWest's evidence on this point. (Maj. opn., pp. 22-25.) But the evidence, including the inspection report prepared by Trinity Inspection Services, LLC (Trinity), permits no such inference. It shows Trinity's inspector provided explanations for many of the downward reductions from percentages determined by a *different* inspection company, Digital Draw Network (DDN).[4] And, the evidence further shows that on January 7, 2010, a "comment" was added stating: "lender requesting a second look at lines 605, 802, 803, 810 and 821 [lines showing downward reductions] since DDNs percentages [*sic*] were higher, and per the borrower line 815 is done." This does not suggest or permit an inference of OneWest's intent to defraud by pressuring Trinity to reduce percentages, but shows quite the opposite, that is, OneWest's concern on plaintiff's behalf that the reduced percentages be checked for accuracy. Nor would I reject the declaration of Trinity Real Estate Solutions, Inc.'s president, Brad Meyer, who averred he was employed by Trinity since its formation and familiar with the process Trinity undertakes in inspecting real property, described that process, and stated, "The Inspector's report and Trinity's Risk Management Department's review of the [inspection] report is made without influence by any outside party. In other words, the reports created by Trinity's Inspector's [*sic*] and their conclusions therein are based solely

---

4    For example, as for "Exterior Doors," which went from 100 to 80 percent completion, the inspector wrote: "Previous 80, Entry door not yet installed." For the "Tub/Shower/Enclosures," the percentages for which decreased from 100 to 85 percent, the inspector wrote: "[P]revious 70, areas covered with plastic, master bath not done." For the "Pool/Spa," which went from 90 to 80 percent completion, the inspector wrote: "[N]eed plaster and equipment." OneWest vice president Jeanie Caldwell averred in her declaration that "[DDN] performed inspections of the progress of construction of improvements on the Property for the defendants' benefit."

upon the Inspector's personal observations of the construction on the property and the Risk Management Department's review, and the conclusions of the Inspector's reports are based solely upon the facts contained within the Inspector's reports."  In my view, Meyer provided ample foundation and personal knowledge to describe not opinions but factual matters—Trinity's custom and business practices used in preparing its inspection reports—which is competent and admissible evidence.  (Evid. Code, § 1105 ["Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom"]; see *Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 733 ["evidence of custom and practice in a business is admissible as circumstantial evidence of conduct on a particular occasion"], abrogated on other grounds in *Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 74, fn. 3.)  Plaintiff did not present direct or circumstantial evidence raising a triable fact issue as to whether Trinity's custom and practice was not followed in this case.

Finally, I would conclude as a matter of law there is no tort duty of care owed by defendants to plaintiff, and thus plaintiff cannot maintain a cause of action for negligence.  This court has previously explained:  "The law of torts is concerned with the compensation of individuals who have sustained injury as a result of the unreasonable conduct of another.  Since tort liability is ultimately imposed to achieve a desirable social climate, 'public policy' plays a major role in determining the standard of conduct required by a particular fact situation."  (*Wagner v. Benson* (1980) 101 Cal.App.3d 27, 34.)  In *Wagner*, this court declined to hold a bank had a duty of care in connection with its loan

8

approval to inexperienced investors about the risk of their investment because the lender did not have extensive control and share of profits but rather exercised "[n]ormal supervision of the enterprise . . ." for protecting its security interest in the loan collateral. (*Id.* at p. 35.) Under the present facts, I would abide by the principle stated in *Wagner* that a bank's "[l]iability to a borrower for negligence arises only when the lender 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender.' " (*Id.* at p. 35, quoting in part *Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 864;[5] see, e.g., *Ragland v. U.S. Bank Nat. Assn.* (2012) 209 Cal.App.4th 182, 206 ["No fiduciary duty exists between a borrower and lender in an arm's length transaction"]; *Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 740 [a commercial lender is not to be regarded as the guarantor of a borrower's success and is not liable for the hardships which may befall a borrower]; *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 ("[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money"].)

---

[5] Thus, in *Conner v. Great Western Sav. & Loan Assn.*, *supra*, 69 Cal.2d 850, the court held a savings and loan association lender owed a duty of care to its shareholders and home buyers where it took on ramifications "beyond the domain of the usual money lender" by voluntarily undertaking business relationships with borrowers to develop a tract and a market for tract houses in which prospective buyers would be directed to the bank for their financing. (*Id.* at p. 864.) The California Supreme Court followed *Conner*'s analysis but distinguished the case in *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 58-59.

9

These principles extend to construction lenders. (Accord, *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 977, 980 [no fiduciary or special relationship between a construction lender, which was responsible for disbursing loan proceeds in accordance with a disbursement plan, and borrower where "there [was] no indication that the Bank had any say in the operation of the construction project" and the matter was otherwise "a straightforward commercial transaction"; plaintiff had no claim that the bank negligently failed to disburse proceeds when the evidence showed it did so in accordance with the loan agreement].) Defendants' conduct in making or withholding disbursements under the construction loan "falls far short of the extensive control and shared profits which give rise to liability." (*Wagner v. Benson*, *supra*, 101 Cal.App.3d at p. 35.)

On the facts presented here, the same conclusion cannot be reached as the court did in *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872. In *Jolley*, the appellate court recognized the general no duty-of-care rule as to financial institutions, but held the general rule could not be applied where the plaintiff recited "specific representations" (*id*. at p. 898) by the successor construction lender about the likelihood of a loan modification that the lender ultimately did not offer,[6] and presented evidence

---

6    Specifically, the *Jolley* plaintiff was told "there was a 'high probability' that [the lender] 'would be able to modify the loan so as to avoid the foreclosure' " and it was " 'likely' when construction was complete he could roll the construction loan into a fully amortized conventional loan." (*Jolley v. Chase Home Finance, LLC*, *supra*, 213 Cal.App.4th at pp. 880-881.) The *Jolley* court held these were promises on which the lender " ' "should reasonably expect to induce action or forebearance of a definite and substantial character on the part of [Jolley] and which does induce such action . . . ." ' " (*Id*. at p. 897.) Jolley testified that as a result of these representations he was induced to borrow heavily to finish the project and that inordinate delay during the loan modification

10

that the predecessor lender lost documents causing delays in disbursements, and engaged in significant irregularities in loan disbursements. (*Id*. at pp. 878, 898.) In reaching its holding, the *Jolley* court identified the specific conduct on which plaintiff based his negligence claim against the successor lender: the lender did not investigate the history of his loan or take into account plaintiff's position before its acquisition of the loan, failed to review his request for a loan modification in good faith, engaged in illegal dual tracking, and prolonged the loan renegotiation period such that it was foreseeable the plaintiff would sustain injury. (*Id*. at pp. 899-901.) Given the lender's "upbeat prediction of the availability of a loan modification" and its dual tracking, the court concluded there was a close connection between the lender's acts and the plaintiff's injury as well as blameworthy conduct sufficient to raise a triable issue of fact as to negligence. (*Id*. at pp. 901, 906.)

Plaintiff here has not shown the same kind of conduct by OneWest. Rather, the disbursements and supervision attendant to construction lending under a construction loan agreement, as well as a construction lender's statements and activities toward protection of its security interest, is part and parcel of such a lender's traditional activity.

For the foregoing reasons, I would affirm the summary judgment in its entirety.


O'ROURKE, J.

---

negotiations prevented him from selling the property before the housing market collapsed. (*Id*. at p. 881.)